SV INVESTMENT PARTNERS, LLC, Schroder Ventures U.S. Fund L.P. 1, Schroder Ventures U.S. Fund L.P. 2, Sitco Nominees, Ltd. VC04001 and SV (Nominees) Limited, Plaintiffs Below–Appellants,

v.

THOUGHTWORKS, INC. a Delaware Corporation, Defendant Below–Appellee.

No. 107, 2011.

Supreme Court of Delaware.

Submitted: Sept. 28, 2011.
Decided: Nov. 15, 2011.

Martin S. Lessner, Esquire, Danielle Gibbs, Esquire and Tammy L. Mercer, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Of Counsel: Daniel M. Abuhoff, Esquire (argued), David W. Feder, Esquire, and Young K. Lee, Esquire, of Debevoise & Plimpton LLP, New York, NY, for Appellants.

Kenneth J. Nachbar, Esquire (argued), Megan Ward Cascio, Esquire, Christine Dealy Haynes, Esquire and Eric S. Wilensky, Esquire, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

SV Investment Partners, LLC and an affiliated group of investment funds (collectively "SVIP") brought this action in the Court of Chancery against Thought-Works, Inc. for a declaratory judgment of the meaning of the phrase "funds legally available" as it relates to ThoughtWorks' obligation under its Amended Charter to redeem Series A Preferred Stock. The Preferred Stock was issued by Thought-Works in exchange for a $26.6 million investment and a redemption right of the preferred stockholders upon certain conditions. SVIP also sought a monetary judgment for the full amount of the funds legally available for redemption, which it argued meant surplus. After a trial, the Court of Chancery rejected SVIP's argument and found that the phrase "funds legally available" is not equivalent to "surplus." The court further concluded that even assuming that SVIP were correct in its proffered definition of the phrase, SVIP did not carry its burden of proof. Because the record supports the Court of Chancery's conclusion that SVIP did not show that ThoughtWorks had "funds legally available", even under its own proposed definition of that phrase, we affirm.[1]

### Facts and Procedural History

In 1999, ThoughtWorks retained S.G. Cowen Securities Corporation to explore the possibility of a $25 million private equity investment. SVIP responded to ThoughtWorks' memorandum and the parties began negotiating the terms of SVIP's

---

1. We need not address SVIP's argument that the court below erred by not equating "funds legally available" with the definition of statutory surplus under the Delaware General Corporation Law ("DGCL").

investment. ThoughtWorks and SVIP initially expected an Initial Public Offering ("IPO") within one to two years. Even so, the parties negotiated redemption rights for SVIP in the event that an IPO did not occur.

ThoughtWorks' initial investment memorandum proposed a right to redemption after seven years with quarterly installments over a period of three years. SVIP responded by demanding a redemption right after four years, and then after reconsidering, proposed a redemption right after five years. ThoughtWorks then proposed a pay-out period of two years, which SVIP rejected. The parties ultimately agreed upon a redemption right after five years, subject to funds being legally available. On April 5, 2000, SVIP invested $26.6 million in exchange for 2,970,917 shares of Preferred Stock.

SVIP's investment required that ThoughtWorks amend and restate its certificate of incorporation. As amended, Charter Article IV(B), Section 4(a) (the "Redemption Provision") relevantly provides:

> On the date that is the fifth anniversary of the Closing Date . . ., if, prior to such date, the Company has not issued shares of Common Stock to the public in a Qualified Public Offering . . . each holder of Preferred Stock shall be entitled to require the Corporation to redeem for cash out of any funds legally available therefor and which have not been designated by the Board of Directors as necessary to fund the working capital requirements of the Corporation for the fiscal year of the Redemption Date not less than 100% of the Preferred Stock held by each holder on that date. Redemptions of each share of Preferred Stock made pursuant to this Section 4

shall be made at the greater of (i) the Liquidation Price and (ii) the Fair Market Value . . . of the Preferred Stock.[2]

The Redemption Provision includes two limitations on SVIP's right of redemption, neither of which were defined. First, redemption may only be made out of "funds legally available therefor." Second, funds designated by the Board as working capital for the first fiscal year after the redemption date may not be included in the determination of "funds legally available." Additionally, in the event that ThoughtWorks is not able to redeem all of the Preferred Stock, the Amended Charter provides that:

> funds to the extent so available shall be used for such purpose and the Corporation shall effect such redemption pro rata according to the number of shares held by each holder of Preferred Stock. The redemption requirements provided hereby shall be continuous, so that if at any time after the Redemption Date such requirements shall not be fully discharged, without further action by any holder of Preferred Stock, funds available pursuant to Section 4(a) shall be applied therefor until such requirements are fully discharged.[3]

### SVIP's First Demand for Redemption

The dot.com bubble burst within three years of SVIP's investment; from that point onwards it was evident that an IPO was not possible for the foreseeable future. In 2003, ThoughtWorks began to consider its options for redeeming the Preferred Stock. The Preferred Stock had a projected value of $43 million and the Board concluded that redemption of the Preferred Stock in 2005 was unrealistic. For the next year-and-a-half, ThoughtWorks

---

2.  Charter art. IV(B), § 4(a).

3.  Charter art. IV(B), § 4(d).

and SVIP discussed possible solutions. In January 2005, ThoughtWorks engaged an investment bank to seek debt financing options in order to redeem the Preferred Stock, and, as a result, SVIP agreed to delay the earliest date of redemption to July 5, 2005. The largest lending proposal that ThoughtWorks was able to receive, however, was $20 million. ThoughtWorks formally offered to redeem SVIP's Preferred Stock for $12.8 million. SVIP rejected that offer.

On May 19, 2005 and May 20, 2005, SVIP sent demand letters exercising its redemption rights, demanding full redemption by July 5, 2005. The Board held a special meeting to discuss SVIP's redemption demand and focused on the working capital limitation in the Charter. It determined that " 'funds required to fund the working capital requirements of the company [were] an amount in excess of available cash on July 5, 2005,' " and the Board declined to redeem SVIP's Preferred Stock.

SVIP disagreed with ThoughtWorks' interpretation of the working capital exclusion. On October 6, 2005, ThoughtWorks filed a complaint in the Court of Chancery for a declaratory judgment, seeking a ruling that Article IV, Section 4 of the Charter allowed ThoughtWorks to exclude necessary working capital from the funds available to pay its redemption obligation to SVIP from year to year. The Court of Chancery found that the working capital set-aside only applied for one year—fiscal year 2005. Therefore, the Court concluded, ThoughtWorks was obligated to redeem SVIP Preferred Stock to *"the extent funds are legally available therefor,"* beginning in 2006.[4] In making that "working capital" exclusion determination the Court of Chancery was not asked to decide, nor did it address, the meaning of the phrase "funds legally available therefor."

## SVIP Continues to Demand Redemption

On August 3, 2006, SVIP demanded that ThoughtWorks redeem the Preferred Stock for the aggregate redemption price at that time, which, SVIP claimed, was $45 million. The Board considered SVIP's demand at its next meeting and, on the advice of legal counsel and financial advisors, used a formula by which it determined that ThoughtWorks had only $500,000 of funds "legally available."[5] ThoughtWorks

---

**4.** *ThoughtWorks, Inc. v. SV Inv. Partners, LLC,* 902 A.2d 745, 754 (Del.Ch.2006) (emphasis added).

**5.** ThoughtWorks obtained legal advice from Freeborn & Peters, LLP, and financial advice from AlixPartners LLC. Freeborn submitted a memorandum to the Board that set forth a process for the Board to follow:

In declaring the amount of legally available funds for redemption, the Board must (a) not declare an amount that exceeds the corporation's surplus as determined by the Board at the time of the redemption, (b) reassess its initial determination of surplus if the Board determines that a redemption based on that determination of surplus would impair the Company's ability to continue as a going concern, thereby eroding the value of any assets (such as work in process and accounts receivable) that have materially lower values in liquidation than as part of a going concern, such that the value assumptions underlying the initial computation of surplus are no longer sustainable and the long term health of the Company is jeopardized, (c) exercise its affirmative duty to avoid decisions that trigger insolvency, (d) redeem for cash, (e) apply the amount declared pro rata to the Redeemed Stock, and (f) recognize the right of the Preferred Shareholders to a continuous remedy if the amount declared is not sufficient to satisfy in full the redemption obligation under the Charter.

*SV Inv. Partners, LLC v. ThoughtWorks, Inc.,* 7 A.3d 973, 980 (Del.Ch.2010).

then redeemed $500,000 worth of Preferred Stock.

On February 8, 2007, SVIP filed the present Court of Chancery action, seeking a declaratory judgment to establish the meaning of the phrase "funds legally available therefor." SVIP also sought to recover the lesser of the full amount of either: (1) the redemption obligation, or (2) "funds legally available therefor." SVIP and ThoughtWorks spent the summer of 2007 in settlement negotiations. The parties resumed formal discovery proceedings during the first half of 2008, but later agreed to postpone discovery and re-enter into negotiations.

Meanwhile, ThoughtWorks sought to acquire third party financing for a potential redemption in August 2009. AlixPartners sent an information memorandum to seventy sources on ThoughtWorks' behalf, and received responses from seventeen. Ultimately, three sources supplied non-binding commitment letters, but only two lenders supplied definitive term sheets. An asset-based lender supplied the first term sheet, which was based on ThoughtWorks' tangible collateral. Given the nature of ThoughtWorks' business, this proposal offered very little financing. A private equity firm provided the second term sheet, which was based on ThoughtWorks ability to generate cash flow. ThoughtWorks signed a commitment letter with the private equity firm for $30 million of debt financing. The $30 million encompassed a $5 million revolving line of credit and $25 million to redeem the Preferred Stock, with the condition that all Preferred Stock holders tender their shares. SVIP rejected that condition, and the commitment letter expired.

## The Redemptions Made by ThoughtWorks

For the sixteen quarters following the first $500,000 redemption, the Board followed the same process to determine the funds legally available for redemption. In every instance, the Board considered its financial state and consulted with its financial advisors. Between 2006 and September 2010, ThoughtWorks redeemed 222,-802 shares of Preferred Stock, for a total of $4.1 million. This amount included 214,-484 of SVIP shares of Preferred Stock. Nevertheless, SVIP claimed that more preferred shares should be redeemed and that the redemption obligation has grown to over $64 million. That state of affairs caused the Chancery action to become reactivated.

## The Court of Chancery Ruling

The Court of Chancery made factual findings and legal conclusions after a two day trial. The Vice Chancellor concluded that "funds legally available therefor" meant cash funds on hand that can be legally disbursed for redemption without violating 8 *Del. C.* § 160 or any other statutory or common law. He rejected the testimony of SVIP's expert witness that "funds legally available" meant statutory "surplus" which could be determined based on a financial valuation of the company. He further concluded that there was insufficient evidence to show that ThoughtWorks had, or was able to secure, funds legally available—even under SVIP's proffered definition—to satisfy the redemption obligation. The Vice Chancellor entered judgment in favor of ThoughtWorks and against SVIP. This appeal followed.

## ANALYSIS

We review the Court of Chan-

cery's conclusions of law *de novo*[6] and its factual findings with deference. We will not set aside the Court of Chancery's factual findings "unless they are clearly wrong and the doing of justice requires their overturn."[7] So long as the Court of Chancery's findings and conclusions are supported by the record and the product of an orderly and logical deductive process, they will be accepted.[8] We accord a high level of deference to Court of Chancery findings based upon an evaluation of expert financial testimony.[9]

SVIP argued at trial that for purposes of the redemption right under the Redemption Provision, "funds legally available" was the equivalent of "surplus" as defined by the DGCL. DGCL Section 160 empowers a Delaware corporation to redeem its shares, subject to certain statutory limits:

(a) Every corporation may ... redeem ... its own shares; provided, however, that no corporation shall

(1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation ... may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock ... if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title.[10]

Capital is impaired "if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined by 8 *Del. C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock."[11] "Net assets" are defined as "the amount by which total assets exceed total liabilities."[12] As provided by Section 160(a)(1), unless a corporation redeems shares and retires them to reduce its capital, "a corporation may use only its surplus for the purchase of shares of its own capital stock."[13] "The General Assembly enacted the statute to prevent boards from draining corporations of assets to the detriment of creditors and the

**6.** *Montgomery Cellular Holding Co., Inc. v. Dobler,* 880 A.2d 206, 219 (Del.2005) (citing *Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1114 (Del.1994)).

**7.** *Montgomery Cellular Holding Co.,* 880 A.2d at 219 (citing *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del.1972)).

**8.** *Polk v. Good,* 507 A.2d 531, 536 (Del.1986) (citing *Levitt,* 287 A.2d at 673).

**9.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1179 (Del.1995) (citing *Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 175 (1991)); *see also Cede & Co. v. Technicolor, Inc.,* 884 A.2d 26, 36 (Del.2005) ("A factual finding made by the Court of Chancery based on a weighing of expert opinion may be overturned only if arbitrary or lacking evidential support.").

**10.** *8 Del. C.* § 160(a)(1).

**11.** *Klang v. Smith's Food & Drug Ctrs., Inc.,* 702 A.2d 150, 153 (Del.1997).

**12.** *8 Del. C.* § 154. Section 154 provides, "Any corporation may, by resolution of its board of directors, determine that only a part of the consideration ... received by the corporation for ... its capital stock ... shall be capital.... The excess ... of the net assets of the corporation over the amount so determined to be capital shall be surplus. Net assets means the amount by which total assets exceed total liabilities. Capital and surplus are not liabilities for this purpose."

**13.** *In re Int'l Radiator Co.,* 92 A. 255, 256 (Del.Ch.1914).

long-term health of the corporation."[14]

█ Based upon the advice it received, the ThoughtWorks board concluded it did not have funds legally available to satisfy SVIP's redemption demand. When a board decides on the amount of surplus available to make redemptions, its decision is entitled to deference absent a showing that the board: (1) acted in bad faith, (2) relied on unreliable methods and data, or (3) made determinations so far off the mark as to constitute actual or constructive fraud.[15] SVIP contends that the ThoughtWorks board's analysis was based upon incorrect legal advice on the meaning of the Redemption Provision.

In its alternative ruling, the Court of Chancery accepted SVIP's proffered definition *arguendo,* but found that SVIP failed to prove its claim. Using that definition, SVIP had the burden of demonstrating at trial that more likely than not, ThoughtWorks had sufficient funds legally available or surplus to satisfy its redemption obligation without impairing its capital in contravention of Section 160.

SVIP relied upon one expert to meet its burden of proof. That expert used three methodologies—the discounted cash flow, comparable companies, and comparable acquisitions methods—in an attempt to show that ThoughtWorks' equity was in the $68–$137 million range and that, therefore, funds were legally available for the redemption. In rejecting the opinion of SVIP's expert, the Vice Chancellor found her testimony insufficient for several reasons:

[She] concededly did not consider the amount of funds ThoughtWorks could use for redemptions while still continuing as a going concern. She never considered how making an eight-figure redemption payment would affect ThoughtWorks' ability to operate and achieve the projections on which her analyses relied. She had no thoughts on how ThoughtWorks might raise the funds for such a redemption payment. *Although defensible as a theoretical exercise, her opinion does not credibly address the issue of "funds legally available."* It does not reflect "real economic value" or bear any relationship to what ThoughtWorks might borrow or its creditors recover. It offers no assistance in determining whether the Board acted in bad faith, relied on methods and data that were unreliable, or made determinations so far off the mark as to constitute actual or constructive fraud.[16]

Additionally, the court noted: "There is no evidence that ThoughtWorks could obtain more funds for redemption or, importantly, that any third party would finance a partial redemption." The court also referenced ThoughtWorks' "thorough canvass" of the marketplace, wherein it contacted seventy potential lenders in an unsuccessful attempt to secure loans to fully satisfy its complete redemption obligations to SVIP.[17]

Because the Vice Chancellor determined that SVIP had failed to prove its case even under its own definition of "legally available funds," we need not reach or address

14. *Klang,* 702 A.2d at 154.

15. *Id.* at 152, 155–56 (noting that absent bad faith, unreliable methods or data, or actual or constructive fraud, a trial court will defer to a corporate board's measurement of surplus); *Cf. Morris v. Standard Gas & Elec. Co.,* 63 A.2d 577, 584–85 (Del.Ch.1949) ("[T]his court cannot substitute either plaintiff's or its own opinion of value for that reached by the directors where there is no charge of fraud or bad faith."). (emphasis added).

16. *Id.* at 989 (emphasis added).

17. *Id.*

the issue of whether SVIP's definition is legally correct. Even if it is correct, the outcome would be the same if the trial court's factual findings are supported by the record.

■ We find that the record in this case supports the Court of Chancery's conclusion that SVIP failed to prove that ThoughtWorks had "funds legally available" (i.e., surplus) to satisfy SVIP's redemption demand. As we have previously explained: "[a] factual finding based on a weighing of expert opinion may be overturned only if arbitrary or lacking any evidential support." [18] Neither circumstance is present here. The Vice Chancellor explained a logical rationale for rejecting the testimony of SVIP's expert witness. Furthermore, there was evidence at trial showing that if SVIP ob-

tained a judgment for the amount of the surplus SVIP's expert claimed, then ThoughtWorks would not be able to meet its obligations, including payroll, and that it would face bankruptcy. Because there was no reversible error by the Court of Chancery in finding that SVIP failed to meet its burden of proof, the judgment of the Court of Chancery must be affirmed.

### Conclusion

The judgment of the Court of Chancery is AFFIRMED.

**18.** *Alabama By–Products Corp. v. Neal,* 588 A.2d 255, 259 (Del.1991) (quoting *Cavalier Oil* *Corp. v. Harnett,* 564 A.2d 1137, 1146 (Del. 1989)).