# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BREVAN HOWARD CREDIT CATALYST MASTER FUND LIMITED, BREVAN HOWARD MASTER FUND, VISIUM CATALYST CREDIT MASTER FUND, LTD., ALJ CAPITAL I, LP, ALJ CAPITAL II, LP, LJR CAPITAL, LP, and CEDARVIEW OPPORTUNITIES MASTER FUND, LP, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 9209-VCG |
| v. | ) ) | |
| SPANISH BROADCASTING SYSTEM, INC., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  June 10, 2014
Date Decided:  June 27, 2014

Stephen E. Jenkins, Catherine A. Gaul, and Peter H. Kyle, of ASHBY & GEDDES, Wilmington, Delaware, Attorneys for the Plaintiffs.

Robert S. Saunders, Nicole A. DiSalvo, Ronald N. Brown, III, and Matthew P. Majarian, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, Attorneys for the Defendant.

GLASSCOCK, Vice Chancellor

This matter is brought by preferred stockholders seeking to enforce rights inherent in their stock. According to the Plaintiffs, the Defendant corporation has breached certain of those rights. The Defendant has moved to dismiss; for the following reasons, that Motion is denied.

## I. FACTS

### 1. The Parties

This action arises out of facts set out in greater detail in a prior proceeding before this Court, *Lehman Brothers Holdings Inc. v. Spanish Broadcasting System, Inc.*[1] The Defendant here, Spanish Broadcasting System, Inc. ("SBS," or the "Company"), a Delaware corporation, is "the largest publicly traded Hispanic-controlled media and entertainment company in the United States."[2] SBS owns and operates Spanish-language radio and television stations, produces live concerts and events, and operates a "bilingual Spanish-English online site providing content related to Latin music, entertainment, news and culture."[3]

The Plaintiffs in this action are current holders of the Company's Series B Preferred Stock ("Series B"). Brevan Howard Credit Catalyst Master Fund Ltd.

---

[1] *Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430 (Del. Ch. Feb. 25, 2014). To the extent the facts presented in that prior proceeding provide useful background information, I refer the reader to that February 25, 2014 Memorandum Opinion. As addressed below, counts alleged in this action that overlap with those presented in the prior litigation have been stayed, and the present Memorandum Opinion addresses only an additional breach of contract claim not litigated in the prior action.

[2] Am. Compl. ¶ 14. The facts cited herein are taken from the Plaintiffs' Verified Amended Complaint unless otherwise indicated.

[3] *Id.* at ¶ 15.

and Brevan Howard Master Fund (collectively, "Brevan") together hold 16,000 shares of Series B, at least some of which were purchased after October 15, 2013. Cedarview Opportunities Master Fund, LP ("Cedarview") holds 1,500 shares of Series B, all purchased after October 15, 2013. ALJ Capital I, LP; ALJ Capital II, LP; and LJR Capital, LP (collectively, "Capital") together hold 5,000 shares of Series B; the Amended Complaint indicates that Capital acquired their shares no later than October 11, 2013.[4] Visium Catalyst Credit Master Fund, Ltd. ("Visium") owns 4,902 shares of Series B; the Amended Complaint indicates that Visium acquired its shares no later than October 14, 2013.[5]

### 2. The Series B Certificate

This litigation centers on the contractual rights of SBS's Series B preferred stock. As of October 15, 2013, there were 92,349 total shares of Series B outstanding. The rights of the holders of Series B preferred stock are delineated in the Certificate of Designations Setting Forth the Voting Power, Preferences and Relative, Participating, Optional and Other Special Rights and Qualifications, Limitations and Restrictions of the 10 3/4% Series B Cumulative Exchangeable, Redeemable Preferred Stock of Spanish Broadcasting System, Inc. (the "Certificate"). Though an equity investment, the rights associated with the Series

---

[4] *See id.* at ¶ 49 ("The ALJ Funds tendered their shares to their broker for repurchase on or about October 11, 2013.").

[5] *See id.* ("Visium demanded repurchase of their shares by letter[] dated . . . October 14, 2013 . . . .").

3

B preferred cause those securities to function much like debt instruments. For one, the Series B preferred are designed to pay to their holders a minimum annual return by issuance of a dividend, which accrues daily and is "payable quarterly in arrears on October 15, January 15, April 15, and July 15 of each year."[6] In addition, because the Series B preferred were issued to finance acquisitions at a time when the Company did not have much cash on hand,[7] the Certificate provided the Company an option, on or before October 15, 2008, to pay dividends to the Series B holders "in kind"—in other words, to "pay dividends in cash or in Dividend Shares."[8] As a result, the Company retained an option, in the first five years after the Series B issuance, to satisfy its dividend obligation by issuing additional Series B shares, although the newly issued shares would themselves accrue dividends going forward. Further, the Certificate granted the Company the option in those first five years, on or before October 15, 2008, to "exchange all but not less than all of the then outstanding shares of Series B Preferred Stock for . . . Exchange Notes to be issued under an indenture . . . ."[9]

Finally, central to the dispute before me here, the Series B preferred also function like debt instruments by providing what may be likened to a maturation

---

[6] Certificate § 4(a); *see id.* ("The Holders of the outstanding shares of the Series B Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds of the Company legally available therefor, dividends on the Series B Preferred Stock, which shall accrue at a rate per annum equal to 10.75% of the Liquidation Preference.").

[7] *Lehman Bros. Holdings Inc.*, 2014 WL 718430, at *1.

[8] Certificate § 4(a).

[9] *Id.* at § 8(a).

date.  For example, Section 6 of the Certificate provides that, "[o]n or after October 15, 2008, Series B Preferred Stock may be redeemed . . . at any time, in whole or from time to time in part, at the option of the Company . . . ."[10]  The Company has never exercised such a right.  However, Section 7 of the Certificate further provides *holders* of Series B shares the right, on October 15, 2013, to *require* the Company to repurchase their shares under certain circumstances described in more detail below.  Under the terms of the Certificate, in the event "the Company fails to discharge any redemption or repurchase obligation with respect to the Series B Preferred Stock (whether or not the Company is permitted to do so by the terms of the Senior Credit Facilities, the Senior Subordinated Notes, the DGCL, or any other obligation of the Company),"[11] a Voting Rights Triggering Event ("VRTE") occurs, and, as a result, the holders of Series B receive certain rights, including rights to fill seats on the Company's board of directors and to block the Company's incurrence of certain debt.

### 3. The Series B Repurchase Right

As noted above, Section 7 of the Series B Certificate grants holders of Series B, on October 15, 2013, the right to require the Company to repurchase some or all of their shares, subject to certain limitations.  On October 15, 2013, of the 92,349 shares of Series B outstanding, holders of virtually all of the shares—92,233—

---

[10] *Id.* at § 6(a).
[11] *Id.* at § 9(b)(ii).

sought to exercise their repurchase rights.  In response, the Company repurchased 1,800 shares for approximately $2.5 million, but took the position that it lacked sufficient "legally available funds" to repurchase additional shares.  SBS acknowledged in an October 17, 2013 Form 8-K that its failure to repurchase all shares from holders seeking to exercise their repurchase rights caused the occurrence of a VRTE.

The parties dispute what obligations are created on the part of the Company by Section 7, governing the repurchase rights of the Series B holders.  That Section provides, in part:

> (a) On October 15, 2013 (the "Purchase Date"), each Holder of shares of Series B Preferred Stock will have the right to require the Company to repurchase (subject to the legal availability of funds therefor and to Section 170 of the DGCL) all or a portion of the Series B Preferred Stock held by such Holder at a purchase price equal to 100% of the Liquidation Preference thereof, plus all accumulated and unpaid dividends to the date of repurchase (the "Purchase Price"), in accordance with the procedures set forth below.
> . . .
> (g) No Series B Preferred Stock may be repurchased except with funds legally available for the purpose.  The Company shall take all actions required or permitted under the DGCL to permit any repurchase pursuant to this Section 7.[12]

The Plaintiffs contend that SBS has breached its obligations under Section 7 in two ways.  First, the Plaintiffs read the second sentence of subsection (g)—that "[t]he Company shall take all actions required or permitted under the DGCL to permit

---

[12] *Id.* at § 7.

any repurchase"—as creating an obligation on the part of the Company to take all actions that could generate funds to repurchase the Series B (such as issuing additional equity, taking on new debt, or selling assets), so long as those actions would not violate the DGCL, that is, the Plaintiffs regard the second sentence as an obligation to go *beyond* use of "legally available funds." Second, the Plaintiffs contend that, even if SBS's obligation under subsection (g) is limited to the use of "legally available funds," that understanding itself implies an obligation on the part of the Company to assess what legally available funds may be raised, using the mechanisms described above, when considering the repurchase requests of the Series B holders.[13] Accordingly, the Plaintiffs allege in their Amended Complaint that the Company breached Section 7(g) of the Certificate by "fail[ing] to take any actions required or permitted by the Delaware General Corporation Law, such as selling assets or issuing and selling additional equity, which would have given it 'legally available funds' with which to repurchase the Series B Preferred Stock as required by the Certificate."[14]

---

[13] The Defendant likewise concedes that "[t]hose procedures [required by Section 7] included . . . a determination of the amount of funds legally available for any potential repurchase . . . ." Def.'s Op. Br. in Supp. of Mot. to Dismiss at 7.

[14] Am. Compl. ¶ 50 (typeface altered from original); *see also id.* at ¶ 51 ("The Company failed to take any actions to aid in the repurchase of the Series B Preferred Stock despite previously acknowledging that '[t]he source of funds for any such repurchases would be our available cash or cash generated from operations or other sources, including borrowings, sales of equity or funds provided by a new controlling person or entity.'") (typeface altered from original).

### 4. Indenture Restrictions

Although only tangentially referenced in the Amended Complaint,[15] the Defendant explains in briefing that, in February 2012, SBS "closed an offering of senior secured notes due 2017, paying 12.5% interest on a total $275 million principal amount."[16] According to the Defendant, "[t]he terms of the Senior Secured Notes Indenture governing the 2012 Notes . . . restrict SBS's ability to take certain financial actions," including repurchasing the Series B shares except in four circumstances.[17] The Defendant explains that the Indenture permits (1) a repurchase if it is made from "a one-time $2.5 million 'general basket' from which Restricted Payments may be made at any time;"[18] (2) a repurchase "if, prior to making the repurchase offer, SBS first commences and settles an offer to buy back the 2012 Notes in an aggregate amount equal to that of the proposed stock repurchase;" (3) a repurchase if it is funded "out of the proceeds of, the concurrent issuance of certain junior indebtedness in accordance with" the Indenture provisions; and (4) a repurchase if it is funded "out of the proceeds of, new Preferred Stock issued in accordance with" the Indenture provisions.[19] In addition,

---

[15] *Id.* at ¶ 47.
[16] Def.'s Op. Br. in Supp. of Mot. to Dismiss at 8.
[17] *Id.*
[18] The partial repurchase was in fact made from this $2.5 million "basket." Def.'s Op. Br. in Supp. of Mot. to Dismiss at 28.
[19] *Id.* at 8-9.

the Defendant represents that the Indenture places restrictions on the Company's ability to sell assets.

### 5. Procedural History

The Plaintiffs filed their Complaint in this action on December 27, 2013. On March 3, 2014, the Plaintiffs filed an Amended Complaint. The Amended Complaint alleges counts for (I) a declaratory judgment that a VRTE went into effect on April 15, 2010; (II) breach of contract based on the Company's 2011 and 2012 incurrence of debt while a VRTE was purportedly in effect; (III) breach of contract based on the Company's failure to meet its obligations under Section 7 of the Certificate, governing repurchase of the Plaintiffs' Series B shares; and (IV) breach of the implied covenant of good faith and fair dealing. On March 31, 2014, the Defendant moved to dismiss the Amended Complaint for failure to state a claim upon which relief could be granted. On June 10, 2014, I heard oral argument on the Defendant's Motion with respect to Count III, and stayed this action with respect to Counts I, II, and IV, pending the Supreme Court's resolution of the plaintiffs' appeal in the earlier filed action, *Lehman Brothers Holdings Inc. v. Spanish Broadcasting System, Inc.*[20] In the remainder of this Memorandum Opinion, I address the Defendant's Motion to Dismiss Count III of the Amended Complaint.

---

[20] 2014 WL 718430 (Del. Ch. Feb. 25, 2014).

## II. STANDARD OF REVIEW

When considering a motion to dismiss, this Court must assume as true the well-pleaded allegations in the complaint,[21] and give the plaintiff "the benefit of all reasonable inferences that can be drawn from its pleading."[22] Accordingly, a motion to dismiss may be granted only where "the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[23] A complaint "need only give general notice of the claim asserted,"[24] but conclusions will not be assumed to be true without "specific allegations of fact which support the conclusion."[25] In deciding a motion to dismiss, I may rely on documents incorporated in the complaint as well as the allegations of the complaint itself.[26]

## III. ANALYSIS

The Defendant contends that Count III of the Amended Complaint fails to state a claim because (1) the Plaintiffs who fail to plead that they owned shares of Series B on the October 15, 2013 repurchase date either lack standing or cannot adequately plead that they suffered damages, and (2) even accepting as true the

---

[21] *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001).

[22] *In re USACafes, L.P. Litig.*, 600 A.2d 43, 47 (Del. Ch. 1991).

[23] *Bettis v. Premier Pool & Prop. Mgmt., LLC*, 2012 WL 4662225, at *2 (Del. Ch. Sept. 26, 2012).

[24] *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985).

[25] *Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch. 1983).

[26] *See LNR Partners, LLC v. C-III Asset Mgmt. LLC*, 2014 WL 1312033, at *9 (Del. Ch. Mar. 31, 2014) ("Generally, on a motion to dismiss under Rule 12(b)(6), the Court will consider only the complaint and the documents integral to or incorporated by reference into it.").

allegations of the Amended Complaint, the remaining Plaintiffs fail to adequately plead that SBS breached Section 7 of the Series B Certificate. I address those contentions in turn, below.

## 1. Standing

As a threshold matter, the Defendants contend that those Plaintiffs who did not hold shares of Series B on the October 15, 2013 repurchase date lack standing to bring a claim, or, put another way, that those Plaintiffs "cannot allege that they were harmed by any of SBS's purported breaches of the Certificate . . . ."[27] As noted above, Brevan and Cedarview purchased some or all of their shares of Series B after October 15, 2013, the date on which, according to the Plaintiffs, SBS failed to comply with Section 7 of the Series B Certificate.

The Plaintiffs contend that "[t]here is no need . . . for Plaintiffs to allege when they became holders of the Series B Preferred stock so long as they are the current holders because, as a matter of law, the current holder of the shares has authority to enforce the Certificate, including for any previous breaches."[28] In support of that contention, the Plaintiffs point to 6 *Del. C.* § 8-302(a), which states that, "[e]xcept as otherwise provided in subsections (b) and (c), a purchaser of a certificated or uncertificated security acquires all rights in the security that the

---

[27] Def.'s Op. Br. in Supp. of Mot. to Dismiss at 17.
[28] Pls.' Answering Br. in Opp'n to Def.'s Mot. to Dismiss at 48-49.

11

transferor had or had power to transfer."[29]  The Plaintiffs accordingly assert that the right to sue for breach of the Certificate was a right in the Series B securities that passed to the Brevan and Cedarview Plaintiffs when they purchased their Series B shares after SBS's purported October 15, 2013 breach.

In considering whether certain rights transfer to a purchaser of a security in accordance with 6 *Del. C.* § 8-302(a), this Court has explained that "[t]he phrase 'all rights in the security' can be understood as distinguishing between personal rights of the holder, on the one hand, and rights that inhere in the security itself, on the other."[30]  In applying that understanding here, I note that a right inherent in the Series B preferred stock at issue is the right, under certain circumstances, to a repurchase of the shares by the Company at a set price on a date certain.  The Plaintiffs contend that this right has been breached, and seek specific performance, which will require that each Plaintiff own, and be able to tender, those shares.  A right to performance of a promise to repurchase is a right inherent in these securities, and thus was transferred, upon sale of the shares, to the purchaser.  I therefore find that all the Plaintiffs have standing here.[31]

---

[29] 6 *Del. C.* § 8-302(a).

[30] *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001); *see also Schultz v. Ginsburg*, 965 A.2d 661, 667 n.12 (Del. 2009) ("The phrase 'all rights in the security' means rights in the security itself as opposed to personal rights.").

[31] Although it does not form the basis of my decision here, I note that the behavior of the parties in fact indicates that at least some of the holders of shares of Series B believed they were selling, along with their shares, a right to pursue a claim for breach of the Certificate: Brevan purchased shares from, and subsequently entered this litigation in place of, River Birch Master Fund, L.P.

## 2. Contract Claim

The Defendant also contends that Count III of the Amended Complaint fails to state a claim upon which relief may be granted because (1) SBS complied with the unambiguous terms of Section 7(g) of the Certificate, and (2) even if SBS had not complied with Section 7(g), the Plaintiffs fail to satisfy the requisite pleading standard for a breach of contract claim. For the reasons that follow, I find that the Defendant's interpretation of Section 7(g) is correct, but that the Amended Complaint states a claim for breach of that Section.

### A. *Section 7(g) is Unambiguous*

As explained above, both the Plaintiffs and Defendant submit that the language of Section 7(g) of the Certificate, which codifies the repurchase rights of the Series B holders, is unambiguous. The parties dispute, however, what obligations are imposed on the Company by the language of that Section. Section 7 states:

> (g) No Series B Preferred Stock may be repurchased except with funds legally available for the purpose. The Company shall take all actions required or permitted under the DGCL to permit any repurchase pursuant to this Section 7.[32]

---

and River Birch Ltd., after the initial Complaint in this action was filed. River Birch Master Fund, L.P. and River Birch Ltd. have withdrawn and are no longer pursuing rights arising from these securities.

[32] Certificate § 7.

13

Under the Plaintiffs' interpretation of this provision, the requirement that "the Company shall take all actions . . . permitted under the DGCL" obligates the Company to take all possible actions that would result in generating legally available funds from which the Company could satisfy its repurchase obligations, so long as those actions are not prohibited by the DGCL. The Defendant rejects that broad reading of Section 7(g), contending instead that the requirement to "take all actions required or permitted under the DGCL" creates an obligation only to "take the necessary steps established by the DGCL for a Delaware corporation to repurchase shares."[33] For the reasons that follow, I concur with the Defendant's interpretation of the unambiguous language of Section 7(g).

Reading the Certificate as a whole, I find unreasonable the Plaintiffs' interpretation of Section 7(g) as creating an obligation on the part of the Company to generate funds by taking all actions not prohibited by the DGCL. Section 7(a), which provides that the right to repurchase is "subject to the legal availability of funds therefore and to Section 170 of the DGCL," clearly imposes two conditions on a right to repurchase: (1) that the repurchase be made from legally available funds, and (2) that the repurchase comply with the DGCL. Section 7(g) mirrors those two requirements, by stating (1) that "[n]o Series B Preferred Stock may be repurchased except with funds legally available for the purpose," and (2) that

---

[33] Def.'s Op. Br. in Supp. of Mot. to Dismiss at 20.

14

"[t]he Company shall take all actions required or permitted under the DGCL" to effectuate a repurchase.

Importantly, under the Plaintiffs' reading, the first sentence of Section 7(g), which requires that a repurchase must be made from "legally available funds," would lose all meaning. While Plaintiffs' counsel suggested at oral argument that the requirement that a repurchase be paid from "funds legally available" operates to provide a "backstop" to the otherwise infinitely broad obligation, imposed by the second sentence of Section 7(g), to generate funds by taking all actions not prohibited by the DGCL, I am unable to comprehend how such a "backstop" would operate; the Company's obligation to repurchase shares must *either* be limited by "funds legally available," *or* the Company must generate additional funds by taking *all actions not prohibited* by the DGCL—one standard or the other must govern.

Reading the Certificate as a whole confirms that Section 7(g) must be read, as the Defendant argues, to create only an obligation on the part of the Company to take those steps necessary to comply with the DGCL when repurchasing the Series B shares. As the Defendant points out, Section 6, governing the *Company's* right to redeem the Series B shares, also states:

15

(f) No Series B Preferred Stock may be redeemed except with funds legally available for the purpose. The Company shall take all actions required or permitted under the DGCL to permit any redemption which the Company elects pursuant to clause (a) above.[34]

Section 6 creates a right of the Company to repurchase, at its discretion. The parties cannot have intended, by stating that "[t]he Company shall take all actions . . . permitted under the DGCL," to create an *obligation* for the Company, once it *elects* to redeem shares, to generate funds by all legal means. Rather, the only reasonable interpretation of that language is that the parties intended to require the Company, if it elects to redeem shares, to accomplish such a redemption in compliance with the DGCL. Similarly, the only reasonable interpretation of the parallel language under Section 7 is that, when considering repurchase requests on behalf of the Series B holders, the Company must accomplish whatever repurchases it makes in compliance with the DGCL, and must do so only with legally available funds.

*B. The Plaintiffs Sufficiently Plead a Claim for Breach of Contract*

I found above that the unambiguous language of Section 7(g) does not obligate the Company to fund a repurchase of the Series B preferred by taking all possible actions that would generate funds. Rather, the second sentence of that Section requires only that the Company comply with the DGCL in accomplishing a repurchase. The Defendant concedes, however, that Section 7 does create an

---

[34] Certificate § 6(f).

obligation on the part of the Company to make "a determination of the amount of funds legally available for any repurchase,"[35] and that, consistent with case law interpreting the phrase,[36] "legally available funds" do not consist solely of available cash, but also of funds "readily accessible through *sales or borrowing*."[37] While the Defendant concedes that the Company was contractually obligated to determine whether the Company had legally available funds to repurchase the Series B preferred on October 15, 2013, however, it contends that the Plaintiffs have failed to plead, other than in an insufficient, conclusory fashion, a breach of that obligation.

The Plaintiffs plead that "the Company failed to take any actions or explore any options that would have given it legally available funds with which to purchase the outstanding Series B Preferred Stock," and that "[h]ad the Company taken the appropriate actions, such as selling assets or issuing and selling additional equity, it would have had sufficient funds to repurchase the outstanding Series B Preferred

---

[35] Def.'s Op. Br. in Supp. of Mot. to Dismiss at 7; *see also id.* at 22 ("But SBS is already obligated to explore means of funding a requested repurchase, because the Certificate requires SBS to determine the amount of 'funds legally available' in response to a repurchase request.").

[36] *See SV Inv. Partners, LLC v. ThoughtWorks, Inc*., 7 A.3d 973, 988 (Del. Ch. 2010), *aff'd* 37 A.3d 205 (Del. 2011) ("'Funds legally available' means something different. It contemplates 'funds' (in the sense of cash) that are 'available' (in the sense of on hand or readily accessible through sales or borrowing) and can be deployed 'legally' for redemptions without violating Section 160 or other statutory or common law restrictions, including the requirement that the corporation be able to continue as a going concern and not be rendered insolvent by the distribution.").

[37] Def.'s Op. Br. in Supp. of Mot. to Dismiss at 22 (emphasis added).

Stock."[38]   The Defendant contends that these allegations are conclusory, and accordingly cannot withstand a motion to dismiss.  The Plaintiffs, however, have alleged a breach of a conditional right—the right to a repurchase—where the occurrence of the condition—the existence of legally available funds—is exclusively within the Defendant's knowledge and control.[39]  The Plaintiffs have alleged that the Defendant failed in its obligation to evaluate whether the condition occurred, and at the current stage of the litigation, that allegation is sufficient to provide the Defendant notice of their breach of contract claim.[40]

In addition, Defendant's counsel suggested at oral argument that the Plaintiffs' allegations cannot be understood to allege that SBS breached its obligation to determine whether "legally available funds" existed, but only that SBS failed to generate funds in *addition* to existing legally available funds, that is,

---

[38] Am. Compl. ¶¶ 63, 65.

[39] *See, e.g.*, *Corporate Prop. Assocs. 8, L.P. v. Amersig Graphics, Inc.*, 1994 WL 148269, at *3 (Del. Ch. Mar. 31, 1994) ("This said, I find that [the plaintiffs'] pleadings, while less than ideal, state a minimally sufficient claim . . . to survive a motion to dismiss.  The complaint alleges ASG's and Foote's insolvency as well as that ASG and Foote received less than fair consideration for the asset transfer.  Given the fact that the value of the assets transferred to AS Memphis and AS Southeast as well as the amount of debt forgiven by Heller as a consequence of the asset transfer are *particularly within the knowledge of defendants*—especially in light of the fact that plaintiffs have had no opportunity to conduct discovery—plaintiffs' allegations are not merely conclusory, but sufficiently state a claim under 6 *Del. C.* § 1304.") (emphasis added).

[40] *See Cent. Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011) ("The pleading standards governing the motion to dismiss stage of a proceeding in Delaware, however, are minimal.  When considering a defendant's motion to dismiss, a trial court should . . . accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim . . . .   Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss.").

the Defendant contends that the Plaintiffs' allegations are limited to their theory that the Defendant was required to resort to any non-prohibited lengths to generate funds, a theory I rejected above. Our pleading standard is not so exacting, however.[41] In the interest of precision, the Plaintiffs could, perhaps should, have pled that the Company failed to take any actions or to explore any options that would have generated cash and that should have been included in the Company's determination of its legally available funds. However, by pleading that "the Company failed to take any actions or explore any options that would have given it legally available funds," the Plaintiffs sufficiently allege that the Company failed to investigate its options for generating cash that could have been used to repurchase the Series B shares. Accordingly, I find the Plaintiffs' pleadings sufficient to state a claim for breach of contract.

Further, the Defendant attempts to rebut the Plaintiffs' allegation that the Company failed to take any action to determine whether legally available funds existed by pointing to the terms of the Indenture; those terms permit a repurchase of the Series B shares only in limited circumstances, which the Defendant contends were not feasible options for the Company. To decide that issue, I would be required to determine whether the Company could reasonably have offered to buy back the notes, issued junior indebtedness, or issued new preferred stock to fund a

---

[41] *Id.*

repurchase. Whether the Company could reasonably have taken such actions on October 15, 2013 to accomplish the repurchases requested by the Plaintiffs is a factual determination unsuitable for resolution on a motion to dismiss.[42]

Finally, the Defendant suggested in briefing (although not at oral argument) that, even if the Company in fact breached Section 7(g) of the Certificate, the sole remedy available to the Plaintiffs is the occurrence of a VRTE. However, while the Defendant contends that "Plaintiffs' entire damages claim is premised on the notion that the conditions giving rise to a VRTE are also a breach of the Certificate"—in other words, that the Company's failure to repurchase the Series B preferred was the occurrence of a condition that triggered a VRTE, but not a breach of Section 7—the Defendant misconstrues the Plaintiffs' surviving breach of contract claim. That theory is not that *any* failure to repurchase the Series B shares—which unquestionably results in a VRTE—also breached the Certificate, but rather that SBS breached its contractual obligations when it failed to correctly calculate legally available funds.[43] In addition, "our courts have refused to construe a contract as taking away a common law remedy unless that result is

---

[42] Further, to the extent the Plaintiffs contend that funds would have been legally available to accomplish a repurchase had the Company not breached the Certificate by entering into the Indenture, that claim is preserved pending lift of the stay of Counts I, II, and IV.

[43] Def.'s Op. Br. in Supp. of Mot. to Dismiss at 48; s*ee also* Pls.' Answering Br. in Opp'n to Mot. to Dismiss at 47 (conceding that "[i]f SBS acted with utmost good faith and relied on detailed analyses developed by well-qualified experts to engage in a thorough analysis of whether it could generate legally available funds, and thus lawfully determined it could not make the repurchase, then a VRTE would be the result of that failure").

imperatively required," and as a result, "the Supreme Court has held that, even if a contract specifies a remedy for breach of that contract, a contractual remedy cannot be read as exclusive of all other remedies if it lacks the requisite expression of exclusivity."[44]   Accordingly, to the extent the Defendant did not waive its contention that a VRTE is the exclusive remedy for a breach of Section 7 by failing to present it at oral argument, that contention must fail.

To summarize, I find that Count III of the Amended Complaint adequately pleads that SBS breached the Series B Certificate by failing in its contractual obligations to undertake appropriate actions to determine what "legally available funds" were at the Company's disposal as of October 15, 2013.

## IV. CONCLUSION

For the reasons explained above, I deny the Defendant's Motion to Dismiss Count III of the Amended Complaint.  An appropriate Order is attached.

---

[44] *Reid v. Thompson Homes at Centreville, Inc.*, 2007 WL 4248478, at *5 (Del. Super. Nov. 21, 2007); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002 ) ("[T]his Court has held that, even if a contract specifies a remedy for breach of that contract, 'a contractual remedy cannot be read as exclusive of all other remedies [if] it lacks the requisite expression of exclusivity.'") (citing *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 336 A.2d 211, 214 (Del. 1975)).  Although the Defendant contends that the Court should not read in additional preferences where the preferred stockholders did not bargain for them, it puts forth no support for the contention that the right to sue for breach of an agreement is the sort of unexpressed "preference" the Court must not presume.