# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CONTINENTAL INVESTORS FUND LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 10164-VCL |
| TRADINGSCREEN INC., PHILIPPE BUHANNIC, PIERO GRANDI, PIERRE SCHROEDER, and PATRICK BUHANNIC, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 11, 2021
Date Decided: July 23, 2021

Kevin G. Abrams, John M. Seaman, Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

Brian C. Ralston, Jaclyn C. Levy, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendants.*

**LASTER, V.C.**

Plaintiff Continental Investors Fund LLC ("Continental") purchased preferred stock in TradingScreen, Inc. (the "Company") as part of a financing round led by Technology Crossover Ventures ("TCV"). The preferred stock carried a mandatory redemption right that TCV could exercise in its capacity as the holder of a majority of the preferred stock.

In 2013, TCV requested redemption. Continental received notice of TCV's request and exercised its right to participate. After the Company only redeemed a portion of their shares, TCV and Continental filed this action asserting that the Company breached its redemption obligation. TCV took the laboring oar, and the case proceeded through trial.

During post-trial briefing, events transpired that led to a more constructive relationship between the plaintiffs and the Company. The case was stayed.

In 2020, the Company completed a transaction that provided enough capital to redeem all the plaintiffs' shares of preferred stock. The Company and the plaintiffs disagreed on the amount of interest that was due on the redemption payment. TCV reached a settlement with the Company that included a premium over the redemption amount.

Continental declined to participate in the settlement. Continental maintained that the Company breached the redemption obligation in 2013, resulting in interest accruing on the redemption amount at a rate of 13% since the date of breach. Continental's claim to interest depended on proving the underlying breach, so Continental took over as sole plaintiff and resumed litigating the case.

This decision holds that the Company did not breach the redemption obligation. The Company acted properly by redeeming all the shares it could. A committee of directors properly engaged in the judgment-laden task of determining the amount of funds that the

Company could use for redemptions. The directors determined that using a greater amount of cash to redeem more shares threatened the Company's ability to continue as a going concern. Under the governing standard, Continental had the burden of proving that the directors acted in bad faith, relied on unreliable methods or data, or reached conclusions so off the mark as to constitute constructive fraud. Continental failed to carry its burden.

Because the Company did not default on its obligations, Continental is not entitled to interest at a rate of 13% beginning eight years ago. The record shows, however, that the Company had sufficient funds to redeem all of Continental's shares in July 2020. The Company did not redeem Continental's shares until August 2020. The Company paid Continental some interest, but not the full amount of interest due. Continental is entitled to the difference, plus pre- and post-judgment interest through the date of payment.

## I.     FACTUAL BACKGROUND

Trial took place over four days. The parties introduced 662 exhibits, lodged deposition from twenty-four fact witnesses, and presented live testimony from eight fact witnesses and four experts.[1] The parties only agreed to forty-two stipulations of fact.[2]

---

[1] One witness testified both as a fact witness and as an expert.

[2] Citations in the form "PTO ¶" refer to stipulated facts in the pre-trial order. *See* Dkt. 229. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control number or internal page number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section. To constrain the proliferation of footnotes, most citations appear in the text. In

Continental bore the burden of proving the facts supporting its claims. The standard of proof was a preponderance of the evidence.

## A.    The Funds Invest In The Company.

The Company is a global provider of electronic trading solutions that enable institutional investors to access markets, connect with counterparties, and execute trades. Philippe Buhannic co-founded the Company and served from the outset as its Chairman and CEO.[3]

In August 2007, funds managed by TCV (the "TCV Funds") and other sophisticated investors, including Continental, entered into an agreement with the Company to purchase shares of Series D Convertible Preferred Stock (respectively, the "Preferred Stockholders" and the "Preferred Stock"). *See* JX 1. Continental is the family investment vehicle of Philip Purcell, the former CEO of Morgan Stanley. *See* Purcell Dep. 6–8.

---

some instances, typically involving short paragraphs or background information, the supporting citation appears at the end of the paragraph.

[3] PTO ¶¶ 4–5. There are two Buhannics in the case: Philippe and his brother Patrick. To distinguish them, this decision uses their first names. Philippe played a far greater role in the underlying events, and his testimony spanned nearly two days of trial. During that time, the defendants impeached him on multiple occasions, and his demeanor further undermined his credibility. He engaged combatively with opposing counsel, often interrupting the questioning. So extreme was Philippe's behavior that the court took recesses so he could compose himself. Because of Philippe's central role, his testimony remained significant, but the court approached his assertions with care. At times, Philippe testified credibly. When possible however, the court has looked to other sources of evidence. Philippe is now deceased.

To facilitate the issuance, the Company adopted an amended and restated certificate of incorporation. *See* JX 5 ("Charter"). The Charter authorized a total of 8,000,000 shares of Preferred Stock.[4] The TCV Funds purchased 4,340,398 shares, constituting 52.4% of the series. PTO ¶ 10. The magnitude of their holdings made the TCV Funds the "Majority Holders" for purposes of exercising the rights carried by the Preferred Stock. *See id.* ¶ 12. Continental purchased 425,663 shares, representing 5.3% of the series. *See id.* ¶ 11.

The Majority Holders received the right to require the Company to assist the Preferred Stockholders in selling their shares. *See* Charter § 7.1.1. If the Preferred Stockholders were unable to find a buyer during the following nine months, then the Majority Holders could "require the Corporation to purchase all or a portion of such holders shares." *Id.* § 7.1.2. The redemption process involved a series of steps:

- First, the Company and the Majority Holders would notify the other Preferred Stockholders of their right to participate. *Id.*

- Second, the Company and the Majority Holders would negotiate in good faith to determine the fair market value of the Preferred Stock. *Id.*

- Third, if the Company and the Majority Holders could not reach an agreement, then they would jointly select an independent financial advisor who would determine the fair market value of the Preferred Stock. *See id.* §§ 7.1.2, 7.1.4.

- Finally, on a date thirty days after the receipt of the financial advisor's opinion, the Company would redeem the tendered shares of Preferred Stock at the price determined by the financial advisor. *Id.* § 7.1.2.

---

[4] Charter Art. IV § A.1. The Company had previously issued Series A, Series B, and Series C Convertible Preferred Stock. As part of the Series D issuance, the Company "cancelled [those classes] in their entirety" and gave them "the status of authorized and unissued shares of Preferred Stock." *Id.* Art. IV § A.2.

4

The Company was not obligated to pay the full redemption price all at once. The Charter contemplated that the Company would pay the redemption price in three equal installments, with one-third of the price due on the six-month, twelve-month, and eighteen-month anniversaries of the redemption date. *Id.*

The Charter recognized that the Company might be unable to redeem all of the shares tendered due to a lack of sufficient funds. The Charter addressed that risk using the following language:

> In the event the Corporation has insufficient cash to pay the holders of the [Preferred Stock] the full redemption amount due to them under [Section 7.1.2], then the holders of [Preferred Stock] shall share ratably in any cash available pro rata in proportion to the respective amount of [Preferred Stock] held by such holder until all such holders are paid in full.

*Id.* § 7.1.3. The Charter also recognized that the Company might simply default on its obligation. Addressing that possibility, the Charter provided that if the Company "defaults on any payments due pursuant to this [section], interest shall accrue on all amounts then owed pursuant to this [section] equal to an annual percentage rate of thirteen percent (13%)." *Id.* § 7.1.2.

The Company and the Preferred Stockholders supplemented the rights and obligations in the Charter by entering into a stockholders agreement. *See* JX 802 ("Stockholders Agreement"). In Section 7 of the Stockholders Agreement, the parties committed to take action to ensure that the Board had seven seats that would be filled in the following manner:

- The CEO would hold one seat.

5

- Directors designated by the common stockholders would hold two seats.

- Directors designated by the Preferred Stockholders would hold two seats.

- Two independent directors designated by the common stockholders and subject to the approval of the Preferred Stockholders would hold the final two seats.

*Id.* § 7. Through a voting agreement, Philippe controlled the rights held by the common stockholders.[5] As the Majority Holders, the TCV Funds controlled the rights held by the Preferred Stockholders.

As of 2010, Philippe served as the CEO director. Philippe's brother Patrick served as one of the two directors designated by the common stockholders. Pierre Schroeder, an early investor in the Company, served as the other. Robert Trudeau, a general partner of TCV, and Richard Kimball, the founding general partner of TCV, served as the two directors designated by the Preferred Stockholders. In 2015, Frank Placenti replaced Kimball; Placenti was the global chair of the corporate finance and governance practice at Squire Patton Boggs (US) LLP. Piero Grandi served as one of the jointly designated directors. The seat for a second jointly designated director remained vacant.

---

[5] Philippe controlled founders' shares constituting 68.5% of the issued and outstanding common stock. Under a voting agreement, the holders of the common stock committed to vote their shares as determined by the holders of a majority of the common stock. Because Philippe's founders' shares carried a majority of the voting power of the common stock, Philippe could exercise all of the voting power of the common stock under the voting agreement. *See* JX 89 at 34–35; JX 812; JX 815 at '982, '995, '999–003, '017; Philippe Tr. 13.

**B.    TCV Tries to Oust Philippe.**

In 2010, the relationship between Philippe and TCV fractured. Two TCV employees told Trudeau that they thought Philippe was diverting Company resources to another entity that he owned. Trudeau invited Philippe to a meeting at TCV's offices. When Philippe arrived, Trudeau notified him that an independent law firm had been retained to investigate his conduct and that it would be best for him to step down as CEO. Philippe felt blindsided. *See* Philippe Tr. 121–24; Trudeau Tr. 816–22.

The Board ultimately did not take any specific action against Philippe. But Philippe believed TCV had attempted to oust him as CEO and viewed the incident as an act of "war." *See* Philippe Tr. 215.

**C.    The TCV Funds Exercise Their Exit Rights.**

In June 2012, the TCV Funds notified the Company that they intended to sell their Preferred Stock. The TCV Funds asked the Company to engage a financial advisor to facilitate the sale process and to furnish "all documents and materials regarding the Corporation that would customarily be provided to a third-party investor considering a significant preferred equity investment in the Corporation." JX 12. The TCV Funds noted that if they were unsuccessful in selling their shares, then they intended to exercise their redemption rights. *Id.* at 1.

7

In August 2012, the Board formed a special committee to facilitate the sale of the Preferred Stock and handle "related matters" (the "Committee"). JX 602 at 3–4. Initially, its members were Philippe, Grandi, and Schroeder, with Grandi serving as Chair.[6]

In September 2012, the Company created a management presentation and set up a data room for interested parties. *See* JX 20 at 7; Trudeau Tr. 758. Except for that assistance, TCV largely ran the sale process itself. *See* Trudeau Dep. 98–100. TCV solicited at least five potential buyers, but was unable to secure a deal. *See* JX 20; Trudeau Tr. 758–60.

On March 14, 2013, the TCV Funds notified the Company that they were exercising their redemption rights for their shares of Preferred Stock. JX 31. The Company provided notice to the other Preferred Stockholders, and Continental elected to participate as to all its shares. *See* JX 32.

## D.     The Company Retains Advisors And Explores Debt Financing.

With the redemption process unfolding, the Committee recognized that it needed to determine the amount of funds that the Company could deploy to repurchase shares. As part of that process, the Committee evaluated the Company's ability to obtain debt financing to facilitate redemptions.

---

[6] *See* PTO ¶¶ 5–8; JX 602 at 6; Grandi Tr. 463. Minutes from a meeting of the Committee on September 19, 2012, state that Schroeder was elected as Chair, but that appears to be an error. *See* Schroeder Dep. 89–90. Trudeau acknowledged that the TCV Funds and their designees on the Board faced a conflict of interest in connection with the redemption process, warranting the formation of the Committee. *See* Trudeau Tr. 762.

Philippe charged John Gross, the Company's CFO, with leading the search for debt financing. On March 19, 2013, Philippe instructed Gross to secure terms for three lines of credit, each in the amount of $10 million, "with no covenants but to maintain 10 m usd of cash." JX 36 at '699. Gross agreed to conduct the search, but he cautioned that he was "not sure how realistic it is to expect that for a $10MM loan you'll only be required to maintain 10MM in cash with NO other covenants" and that to secure three lines on those terms was "totally unrealistic." *Id.*

Later that day, Gross contacted HSBC to explore a potential financing. *See* JX 63. After discussing various options, Gross asked HSBC to provide a $5 million line of credit to be used for working capital and the redemption. *Id.* HSBC was skeptical about using loan proceeds to redeem equity and asked to review the Company's 2012 financial statements. The Company never sent its financial statements to HSBC. *See id.*; Considine Dep. 51. Due to the combination of the potential use of the loan proceeds and the lack of financial statements, HSBC declined to proceed. *Id.* at 49–51.

In April 2013, Gross contacted JPMorgan Chase & Co. ("Chase"). *See* JX 570 at 1. Gross explained that the Company was contemplating "a $150MM buyout" of the Preferred Stock and was "looking to fund the first payment with ~$20MM of debt and ~30MM of internal cash." *Id.* Gross also told Chase that the "[t]he Company has ~$45MM in cash and needs approximately $5-10MM in cash to operate." *Id.* Gross warned Chase that the financial covenants were "one of the hot-buttons" for Philippe. *See id.* Chase began considering the request.

Also in April 2013, Greenberg Traurig, LLP and Morgan Lewis & Bockius LLP started providing legal advice to the Committee about the redemption process. The firms advised the Committee that "the Company was permitted to defer the redemption if it didn't have 'legally sufficient funds.'" JX 50 at '853. The firms also advised the Committee that when determining the amount of funds available for redemptions, the Company was permitted to retain a level of cash that was needed to maintain its operations. *Id.*

At the end of April 2013, Gross updated Philippe on the financing process. In addition to HSBC and Chase, Gross had contacted Bank of America Merrill Lynch ("BAML"), Webster Bank, CapitalOne, and Wells Fargo. JX 60 at '254. Gross reported that the "key thing" that each bank wanted was a "forecast" of the Company's performance. *Id.* Philippe hesitated over providing forecasts as a first step, telling Gross: "We should not send our information before getting some validation of the possibility that they will work with us. Don't you think? If their conditions or legal are horrible why would we send our accounts for a small credit lines [sic]? We need to be very discrete about our accounts." JX 71 at '076. In other words, Philippe wanted to receive a meaningful indication of interest from a bank before providing the bank with a forecast. Gross explained that the banks wanted the forecast first, telling Philippe: "I can't move forward until we can share a forecast with the bank . . . ." JX 56 at '931–33.

Philippe turned out to be right, at least as far as one bank was concerned. Without receiving projections, Webster Bank sent Gross a term sheet on May 16, 2013, for a

$15 million secured line of credit.[7] The proposal contemplated a covenant establishing a minimum level of quarterly adjusted EBITDA and a requirement for monthly financial reporting. *See* JX 78; *see also* JX 74. The Company's auditor regarded the terms as reasonable. *See* JX 78; JX 81. In an internal memorandum, a Webster Bank representative noted that the bank still needed to "obtain a comprehensive understanding of the redemption issue and the term 'insufficient cash' to determine if any exposure is created for Webster by supplying the company with a line of credit." JX 74 at '393. Talks broke down once the parties had a "conversation about how the redemption might work." *See* Gross Dep. 115–17.

On May 21, 2013, the Committee retained BAML to provide financial advice concerning the redemption. The engagement letter established a compensation structure under which BAML's fees and the redemption price were inversely correlated, i.e., a lower redemption price led to greater compensation for BAML. *See* JX 83 ¶¶ 3–5. If the Company redeemed the Preferred Stock for less than $21 per share, then BAML would receive a fee equal to 7.5% of the difference between the aggregate price paid and the aggregate redemption at $21 per share.[8]

---

[7] Management provided Webster Bank with a PowerPoint presentation, but it did not include projections. *See* JX 78; Gross Tr. 337.

[8] JX 83 ¶¶ 3–5. The terms of the BAML engagement letter thus illustrated the conflict of interest that led to the establishment of the Committee. The Company benefitted from a lower redemption price, and it was in the best interests of the Company and all of its stockholders (other than the holders of the Preferred Stock in their capacities as beneficiaries of the redemption right) for the Company to pay the least amount possible. It was even in the best interest of those holders of Preferred Stock who had not exercised

On June 14, 2013, Gross provided Philippe with another update on the financing process. He explained that it was "difficult to get the combination of an unsecured line with limited financial covenants with a 'traditional bank.'"[9] Philippe responded: "I think we are going nowhere. Please stop the effort. Will pick it up in a differemnt [sic] way later." JX 94 at '183. He also instructed Gross to call the banks and "tell them that [TradingScreen is] not interested any more as their terms are not attractive enough." JX 93 at '056.

Despite Philippe's instructions, Gross kept searching for debt financing. Over the following year, Gross communicated with approximately ten lenders about obtaining a loan secured by the Company's receivables or cash flow. *See* JX 224 at '119; JX 263 at '579. Based on these discussions, Gross ascertained that a cash-flow-based loan was infeasible and that, "best case," the Company could obtain a receivables-based loan in the amount of $2 million. JX 263 at '580. His discussions with lenders revealed that it was "very difficult" for the Company to obtain debt financing because the Company was "asset light" and because the debt would be used at least in part to fund the redemption.[10] The banks did not

their redemption right for the Company to pay the least amount possible. By contrast, the TCV Funds and Continental benefitted from maximizing the value of their contract right through the highest possible redemption price. Continental has complained about BAML's fee structure, but the arrangement aligned BAML's interests with the best interests of the Company and the orientation of the directors' fiduciary duties.

[9] JX 94 at '184; *see also* JX 160 at '484 (Gross's 2013 self-performance review) ("Was unable to obtain unsecured '0' covenant financing. Had multiple meetings with multiple potential partners . . . . None of them would consider financing under these terms.").

[10] *See* JX 327 at '588; *see also* JX 263 at '579 (noting that BAML "cannot underwrite any loans to TradingScreen" because of a "lack of sufficient cash flow" and

12

have any interest in loaning money that immediately would flow out of the Company to redeem equity.

Continental contends that by failing to provide financial statements to HSBC, by hesitating before providing a forecast to the banks, and by telling Gross to stop the process, Philippe tried to scuttle the effort to secure debt financing. Although that is one way to view the evidence, the record shows that Philippe was generally obsessed with confidentiality and reluctant to share financial information.[11] He did not manufacture a set of concerns to torpedo the financing process. The record also indicates that Philippe's resistance to providing financial information and his instruction to Gross to stop the process did not affect the search for debt financing. Gross continued the efforts, and it became clear that the Company could not obtain a material amount of debt financing in any event.

---

"no viable security package"). The Company's projected quarterly cash flow from operations for the following seven quarters fluctuated between -$3.55 million and $3.71 million. *See* JX 330 at 43.

[11] *See, e.g.*, JX 13 at '114–17 (email from Philippe to a member of the Company's Accounting and Finance department referring to Chase requests for information related to a credit line as "intrusive" and instructing the employee to "send them to hell"); JX 345 at '430 (email from Philippe to a potential customer, stating: "We usually provide no information as we are a private company and are not supposed to disclose this information. My board has been consistently refusing to give this information and will continue to do so unfortunately. We never gave this information to any of our clients even contract much larger than the one we are talking about. I am sorry but this is a strict rule for us."). Philippe and Patrick conceded that the Board did not prevent Philippe or the Company from disclosing financial information. *See* Philippe Tr. 31–32; Patrick Dep. 223–24. These incidents nevertheless show that Philippe did not adopt a different stance for purposes of the search for debt financing. He kept all of the Company's financial information close to the vest and resisted sharing it with anyone.

13

## E.    The Redemption Price

As part of the redemption process, the Company and the TCV Funds attempted to reach agreement on the redemption price. PTO ¶ 27. They failed, and on January 6, 2014, the Company and the TCV Funds engaged Centerview Partners LLC as an independent financial advisor under Section 7.1.4 of the Charter. *Id.* ¶ 28.

BAML helped Company management prepare projections for Centerview to use in its valuation. Gross Tr. 369–70. Gross described the projections as a "conservative forecast" and agreed that a lower forecast would "drive down the ultimate value that was generated by Centerview.*" Id.* at 370.

In February 2014, Centerview determined that the fair value of the Company was $120 million, resulting in a redemption price of $16.71 per share. PTO ¶ 29. The TCV Funds responded by withdrawing 310,000 shares from their request for redemption. That step enabled the TCV Funds to continue as the Majority Holders. *See id.* ¶¶ 31–32. The TCV Funds plainly took this step because it was clear that the Company would not be able to redeem all the shares of Preferred Stock, and the TCV Funds wanted to maintain control over the rights that the Preferred Stock carried.

## F.    The Committee Evaluates The Amount Of Cash Available For Redemptions.

Between February and September 2014, the Committee met six times.[12] In March, the Board expanded the Committee's mandate to confirm that it possessed "all authority"

---

[12] *See* JX 175; JX 221; JX 232; JX 246; JX 263; JX 327.

with respect to the redemption process. JX 201 at '724–25. The Board also added Patrick to the Committee. JX 602 at '007.

Morris, Nichols, Arsht & Tunnell LLP joined Morgan Lewis and Greenberg Traurig in providing the Committee with legal advice about the redemption process.[13] The firms advised the members of the Committee that they could and should consider the requirements of the Company's business, its financial prospects in the "intermediate term," and the "long-term health of the company" when determining the amount of funds that were available for redemptions.[14]

In July 2014, the Committee retained AlixPartners LLP to provide additional financial advice regarding the amount of funds that the Company could use to redeem shares. JX 233 at '278. AlixPartners gave a presentation which advised that the Company had surplus of between $16.7 million and $52.1 million, reflecting the difference between the net asset value of the Company and the aggregate par value of its stock. *See* JX 330 at 7. The presentation covered various scenarios for employee compensation, including a scenario that contemplated additional cash compensation. *See* JX 330 at 31, 34, 37, 40, 43. AlixPartners prepared a cash forecast for that scenario (the "AlixPartners Forecast"), which projected that in March 2016, at the low point of the forecast, the Company would have a

---

[13] *See, e.g.*, JX 169; JX 191; JX 192; JX 216.

[14] *See* JX 191 at '219; JX 192 at 2, 4–5; JX 216 at '656. The firms did not define those terms in the context of the redemption process. *See* Schroeder Tr. 634; Patrick Tr. 706; Dudney Tr. 1017.

cash balance of $27.2 million, including $12.7 million in restricted cash held in foreign jurisdictions. JX 330 at 12, 43.

On September 4, 2014, the Committee determined that the Company could use $7.2 million in cash to redeem shares of Preferred Stock. JX 327 at '591. In making its determination, the Committee relied on the AlixPartners presentation, including the AlixPartners Forecast. The Committee also received an analysis from BAML, which determined that the Company had a surplus of $62.7 million using book values and a surplus of $42.0 million using fair market values. JX 190 at 5.

In concluding that the Company had $7.2 million available for redemptions. the Committee started with the low point in the forecast of $27.2 million in cash, then subtracted $20 million to reflect the minimum amount of cash that the Committee believed in its judgment that the Company needed to keep on hand to continue as a going concern. Because of the nature of the Company's business, the Committee determined that the Company needed to retain more than simply an amount of working capital sufficient to cover its bills. The Company's core business involved offering a trading platform for clearing securities trades, so the amount of capital that the Company required to operate as a going concern included a reserve that would demonstrate to trading counterparties that the Company was financially secure and would not default on its trades.[15]

---

[15] *See* Philippe Tr. 240–43; Gross Tr. 439–41; Grandi Tr. 537–39, 565; Schroeder Tr. 669–70; Patrick Tr. 736–37; Trudeau Tr. 837–38; Purcell Dep. 77–79.

The Committee and management generally referred to the total amount of capital that the Company required as "show capital." By using this term, they meant the total amount of capital that the Company needed to show on its balance sheet to reassure any counterparties that the Company had the financial wherewithal to complete trades. *See* JX 327 at '590–91; Gross Tr. 377; Grandi Tr. 489–90. The term was potentially misleading, because it could be understood to suggest that the capital was not really needed and "just for show." Recognizing that fact, Schroeder suggested that the Committee stop using "show capital" and that "Commercial Cash balance florr [sic]" was a more appropriate term. *See* JX 326 at '027. The term nevertheless remained standard, so this decision adopts it.

Importantly, the Committee regarded show capital as an all-in figure. The Committee did not estimate an additional amount, over and above working capital or restricted cash, that the Company needed to reassure counterparties. The Committee instead exercised its judgment to determine the total amount of capital that the Company needed to retain to operate as a going concern, including an amount that would alleviate any potential concern that customers might have about counterparty risk.

### 1. The Committee's Judgment Regarding Employee Compensation

As noted, the Committee determined how much cash the Company could use for redemptions by identifying the amount of cash that the Company would have at the low point of its cash forecast. One of the key inputs in the cash forecast was the amount of cash that the Company needed to pay its employees.

17

When forecasting the Company's cash needs, the Committee considered that the Company usually reached a low point in its cash usage cycle in March or April, after paying bonuses for the prior year. *See* JX 186. The Committee believed that it was essential to retain sufficient cash to pay employee bonuses across two bonus cycles. *See* Philippe Tr. 249; Grandi Tr. 541–42. The members of the Committee believed that if they did not retain that amount of cash, then employees would think their compensation was at risk and would look elsewhere for employment. A cascade of employee departures would represent a "death sentence" for the Company. *See* Grandi Tr. 541–42.

When evaluating the Company's cash forecast, the Committee considered management's plan to increase the amount of cash compensation paid to employees by $5.5 million annually. To support their recommendation, management provided the Committee with an analysis prepared by Pearl Meyer & Company, an outside compensation consultant. JX 346 at '635–38. Pearl Meyer advised that the Company's employee compensation ranked below the 25th percentile of peer companies and that to attract and retain talent, the Company needed to increase base compensation to the 75th percentile. JX 263 at 1, 3. Based on that recommendation, management proposed to increase base salaries by $2.6 million and cash bonuses by $2.9 million. JX 330 at 22.

When using the Company's cash forecast to determine the amount of cash that the Company needed to retain, the Committee did not use the full $5.5 million in management's proposal. The Committee excluded the additional $2.9 million for bonus compensation because the bonuses were tied to performance targets. The Committee only

18

included the additional $2.6 million in base compensation. *See* JX 327 at '590; JX 330 at 22.

As part of its deliberations, the Committee evaluated the merits of paying bonuses in cash versus stock. In the past, the Company had paid bonuses partly in stock. Gross Tr. 459. During the previous two years, however, the Company had paid bonuses in cash. *Id.* Grandi believed that the Company could not "motivate people through the awarding of stock, largely because, with the liability of the redemption, the stock was really not worth a lot." Grandi Tr. 483. The Committee therefore decided that the Company needed to continue paying bonuses in cash. *See* Gross Tr. 459; Grandi Tr. 479–83; Held Tr. 918–19.

Having made these decisions, the Committee determined that at the low point in its cash forecast, the Company would have $27.2 million in cash on hand. The question then became how much cash the Company needed to retain to continue as a going concern.

## 2. The Committee's Judgment Regarding Show Capital

To determine how much cash the Company could use to redeem shares, the Committee evaluated the amount of "show capital" that the Company needed to retain to operate as a going concern. In exercising its judgment on this issue, the Committee considered several inputs.

One input was the Company's historic cash balance. Between 2011 and 2013, the Company's cash balance fluctuated between $32 million and $50 million. *See* JX 186 at '207. These figures obviously exceeded the $27.2 million in cash that the Company would have at the low point of the cycle. Based on the Company's historical practice, the Company did not have additional cash that could be used for redemptions.

19

A second input was the views of Company management, represented by Philippe and Gross. Philippe consistently maintained that the Company needed to retain a balance of $30 million in cash. *See* JX 190 at '846. Gross initially agreed with Philippe, and in early August 2014, they prepared a submission for AlixPartners and the Committee about the "Importance of Cash for Clients/Suppliers." *See* JX 253 at '975. Gross's first draft, dated August 8, 2014, stressed that the Company needed to maintain at least $30 million to convey financial stability to sell-side and buy-side counterparties and noted that this amount was "still well below many of our competitors.*" Id.* Philippe added the following comment about the Company's peers:

> Having a cash balance of less than 20 M USD is a no go zone for all these players . . . . They require at leasyt [sic] 25 M USD of cash balances to be comfortable as they know that it takes at least 20 M USD to stay competitive per year in our business and want a coverage of that risk.

JX 256 at '335; *see* JX 179 at '950; JX 260.

At the end of August 2014, Gross prepared charts to illustrate the cash balance under various scenario. JX 296. Gross presented total show capital and restricted cash separately, showing minimum show capital of $20 million with restricted cash of $8 million. *See id.* at 2. Gross testified at trial that he relied on his own judgment when developing the show capital figure. *See* Gross Tr. 388–91.

A third input was advice from the Company's financial and legal advisors. BAML and AlixPartners did not independently assess the amount of cash that the Company

needed.[16] AlixPartners considered management's estimates and worked with Gross.[17] In its final presentation, AlixPartners presented a range of $20–30 million in cash.[18] Despite depicting the range, AlixPartners did not make a recommendation as to the minimum amount of cash that the Company should maintain. Dudney Tr. 1003–07; *see* JX 330. The Company's legal advisors advised the Committee members that they could consider: "projected cash flows in the near to intermediate term, . . . the Company's past performance and success or failure to meet projections, . . . the Company's current and anticipated debts and business obligations, . . . [and] business concerns unique to the Company that may impact its cash flows." JX 192 at 4–5; *accord.* JX 191 at 5–9; JX 216 at '656–57.

The Committee members then exercised their business judgment. They engaged in a "long debate" about the cash balance that the Company needed to retain. Grandi Tr. 490. They ultimately determined that a cash balance of $20 million was necessary. JX 327 at '591; *see* JX 326 at '027. The Committee thus chose the low end of the range presented by AlixPartners and adopted a figure materially below the $30 million that Philippe proposed.[19]

---

[16] *See* JX 190; JX 261 at '422; JX 287 at '934; Clemow Dep. 151; Dudney Tr. 1003.

[17] *See* JX 302 at 12; JX 310 at 12; *see also* JX 281 at 11; JX 298 at 12.

[18] *See* JX 330 at 12. Gross testified that to support this figure, he prepared "an extremely granular bottom-up projection." Gross Tr. 442–43. Trudeau, the principal witness for the TCV Funds, testified that he had no "major dispute with the projections" on which the cash estimate was based. Trudeau Tr. 860.

[19] At trial, Trudeau agreed that the Company needed to maintain at least $10–15 million in working capital. Trudeau Tr. 790–94. He also agreed that the Company

During their deliberations, the Committee members recognized that their determination would have implications for the amount of cash that the Company could use for redemptions. Schroeder pointed out that at with a high enough cash balance, the Company would not be able to redeem any shares. *See* JX 326 at '027. After taking all of these factors into account, the Committee concluded that the Company needed to retain $20 million in cash to remain a going concern, which meant the Company had $7.2 million in cash that it could use for redemptions. JX 327 at '591.

## G. The Company Redeems Shares.

On September 5, 2014, Philippe informed the Preferred Stockholders that the Committee had approved total redemptions in the amount of $7.2 million at $16.71 per share. PTO ¶ 36. The letters noted that the Committee "will meet on a regular basis, and no less than quarterly, to determine the amount of funds legally available for TradingScreen to make an additional payments [sic] in partial redemption of the shares of [Preferred Stock] that have been the subject of redemption notices." PTO ¶ 36.

The Company sent a check payable to the TCV Funds for $4,400,049.86 in exchange for 263,319 shares. The Company sent a check payable to Continental for $464,703.09 in exchange for 27,810 shares. *See* PTO ¶ 37.

---

needed "at least $10 million to demonstrate financial strength." *Id.* at 838–39. An internal TCV presentation similarly stated that the Company needed $15 million "to stay in business." JX 15 at 3. The internal TCV presentation did not separately address the need for capital to show financial strength. *See id.*

On September 9, 2014, the TCV Funds delivered a notice of default to the Company. JX 336. The notice asserted that the Company had "failed to pay the full amount due to" the TCV Funds, had therefore defaulted, and that consequently "interest shall accrue on all amounts due and owing." *Id.* at '576–77. The notice demanded immediate payment of $18,049,267.01 plus accrued interest. *Id.* at '577.

By letter dated September 18, 2014, the Company disputed that it was in default. The Company maintained that it was "in full compliance with the [Charter] and Delaware law" because the Company used all "legally available funds" to redeem shares of Preferred Stock. JX 344 at '455.

## H.    This Litigation

On September 24, 2014, the TCV Funds and Continental filed suit. The complaint asserted a claim for breach of contract against the Company on the theory that the Company failed to use all "funds legally available" to redeem shares of Preferred Stock. The complaint also sought a declaratory judgment that interest on all amounts due was accruing at a rate of 13% per annum. The complaint further maintained that because the Company had breached its contractual obligations, the full redemption amount, plus interest, was immediately due and owing, notwithstanding that the Charter provided for three equal redemption payments over a period of eighteen months. The complaint also asserted a claim for breach of fiduciary duty against Philippe, Grandi, and Schroeder on the theory that they breached their duty of loyalty when determining the amount of funds available for redemptions. The complaint additionally sought injunctive relief to prevent the

23

Company from "dissipating or otherwise encumbering the Company's assets, including its cash." Dkt. 1.

On October 24, 2014, the TCV Funds and Continental moved for judgment on the pleadings. They argued that Section 160 of the Delaware General Corporation Law (the "DGCL"), which generally precludes a corporation from redeeming shares of stock except out of statutory surplus, established the only restriction on the Company's obligation to comply with the redemption provision. The defendants responded that common law also restricted the Company's ability to redeem the Preferred Stock and that the Company could not make a redemption payment that would threaten its ability to continue a going concern. The parties also disputed whether the Company's failure to redeem all the shares of Preferred Stock constituted a default that caused interest to accrue at a rate of 13% annually. *See* Dkts. 36, 39, 49, 53.

On November 21, 2014, while the motion for judgment on the pleading was pending, the Committee held its next quarterly meeting to consider whether additional funds could be used for redemption. The Committee determined that an additional $2.5 million could be used for redemptions, and the Company used those funds to redeem more shares of Preferred Stock. PTO ¶ 40.

On February 26, 2015, the court denied the motion for judgment on the pleadings. The court held that, "*in addition* to the strictures of Section 160, the undoubted weight of authority teaches that a corporation cannot purchase its own shares of stock when the purchase diminishes the ability of the company to pay its debts, or lessens the security of its creditors." *TCV VI, L.P. v. TradingScreen Inc. (TradingScreen I)*, 2015 WL 1598045,

24

at *5 (Del. Ch. Feb. 26, 2015), *appeal refused*, 37 A.3d 205 (Del. 2011). The court also held that the absence of the term "funds legally available" in the Charter did not change that analysis because a comparable limitation was implied by law. *Id.* at *5. The court concluded:

> To succeed in challenging [the Committee's] decision, a plaintiff must prove that in determining the amount of funds legally available, the board acted in bad faith, relied on methods and data that were unreliable, or made a determination so far off the mark as to constitute actual or constructive fraud.

*Id.* at *7 (internal quotation marks omitted).

The court also held that the plaintiffs were not entitled to a declaration that interest was accruing at an annual rate of 13%. *Id.* at *8. The court explained that the plaintiffs were only entitled to interest under Section 7.1.2 if the Company defaulted on its obligations under the Charter—i.e., by failing to use all "funds legally available" for the redemption. *See id.*

The plaintiffs asked the trial court to certify its decision for interlocutory appeal. The trial court granted certification. Dkt. 78**.** However, by order dated April 7, 2015, the Delaware Supreme Court refused to accept the appeal, noting that the trial court had certified the appeal "even though its decision hewed closely to the Court of Chancery's thoughtful decision in *SV Investment Partners, LLC v. ThoughtWorks, Inc.* and our affirming opinion." *TCV VI, L.P. v. TradingScreen Inc. (TradingScreen II)*, 115 A.3d 1216 (Del. 2015) (TABLE).

## I.    The Potential Equity Transactions

The parties proceeded to conduct discovery. While the parties litigated, the Committee continued to oversee the redemption process and to meet quarterly to evaluate whether additional funds were available for redemptions. On March 5, 2015, one month after the trial court's decision on the motion for judgment on the pleadings, the Committee determined that an additional $500,000 was available for redemptions. *See* PTO ¶ 41; JX 440 at '545.

The Committee also explored significant transactions that might facilitate further redemptions. All involved potential equity issuances. The counterparties in the potential transactions were Deutsche Böerse AG, FactSet Research Systems, Inc., RealTick, and Thomson Reuters Corporation.

### 1.    Deutsche Böerse

In March 2014, the Company entered into discussions with Deutsche Böerse about a potential equity investment. As part of that process, the Company provided Deutsche Böerse with financial information and other due diligence. *See* JX 280; JX 397; Philippe Tr. 67–68. By August 2014, Deutsche Böerse had proposed to pay $68.25 million in exchange for 35% of the Company's common stock. Deutsche Böerse also would receive (i) an option to acquire sufficient additional shares so that Deutsche Böerse would own a majority of the common stock, exercisable before the end of 2016, and (ii) an option to acquire the remaining shares of common stock, exercisable before the end of 2018. JX 309 at '778, '780. The proposal acknowledged that the proceeds would be used in part to redeem the Preferred Stock. *See id.* at '780.

26

In November 2014, Philippe countered by sending Deutsche Böerse a term sheet that contemplated Deutsche Böerse paying $70 million for 33.33% of the Company's outstanding common stock, with the proceeds used entirely to fund a redemption of the Preferred Stock. JX 363. Philippe's proposal included options similar to Deutsche Böerse's proposal. *See id.* at '498.

Discussions between the parties continued, and by May 5, 2015, the parties had agreed on a final term sheet that closely tracked Philippe's counteroffer. *See* JX 517 at '464–76; JX 518. In the subsequent weeks, the parties began drafting a definitive transaction agreement. JX 550. But the parties differed over how to implement the transaction. Eventually, Deutsche Böerse underwent a change in management, moved in a different direction, and stopped communicating with the Company. *See* Philippe Tr. at 79–81, 321–22, 327; Grandi Tr. 542–44, 548–49, 553.

2.    **FactSet**

In January 2015, while the Company was in discussions with Deutsche Böerse, FactSet approached the Company. Grandi Dep. 24. Philippe sent FactSet an overview of the Company and provided financial information. *See* JX 484. He also set a term sheet that contemplated FactSet investing $70 million in exchange for Class B common stock representing 30% of the Company's equity value and carrying 30% of its total voting power. JX 803 at '671. The term sheet included an option for FactSet to acquire majority control and another option to buy out the remaining stockholders. *Id.* at '671–73.

In May 2015, FactSet sent Philippe a letter representing that it was "excited to participate in a potential transaction" and attaching an indication of interest. JX 531 at '078.

The indication of interest proposed an initial investment of $80 million for 46% of the Company's equity, with an option to purchase another 27% of the Company's equity and a second option to purchase its remaining equity, with each priced based on the Company's future performance. *See id.* at '081–82. Philippe regarded the price as too low, and the parties failed to reach a final agreement. Gross Tr. 475–76.

### 3. RealTick and Thomson Reuters

In March 2015, while the discussions with Deutsche Böerse and FactSet were ongoing, Trudeau received informal expressions of interest in the Company from RealTick and Thomson Reuters. *See* JX 466 at 2–3. Trudeau passed the information along to the Committee.

Philippe did not want to engage with RealTick or Thompson Reuters because he viewed them as competitors. *See* JX 824 at '511. He wanted to concentrate on the offers the Company already had received. *Id.*

After considering Philippe's response, the Committee considered the two expressions of interest. The Committee harbored concern that TCV was trying to engineer a sale, and Grandi cautioned Trudeau about any efforts in that direction:

> After having been marketed by bankers and shareholders, including TCV, for several years, further efforts to market the company at this time are likely to be counterproductive and harmful to the company and its shareholders. In order to secure the company's viability as a going concern, the Board and management need to reassure its staff and its clients/customers, who have been severely destabilized by the continuous market rumors concerning the redemption and the long-term viability of the business. . . . I would therefore request that TCV refrain from suggesting [for RealTick or Thomson Reuters] or anyone else that the company is for sale. . . . Please do not hesitate to

28

> provide my personal contact details to [RealTick and Thomson Reuters] so that they can contact me to ascertain if a desirable transaction may be available, thereafter the Committee and the entire Board can decide how to respond.

JX 466 at 1.

Philippe informed a RealTick representative that he believed the Company needed to focus on other opportunities. *See* JX 824 at '511; Grandi Tr. 512. After that exchange, no one from RealTick contacted the Company. Grandi Tr. 558.

Thomson Reuters, however, made contact. In May 2015, a representative of Thomson Reuters reached out to Philippe. *See* JX 543 at '544. Discussions ensued, but Philippe believed a transaction would be difficult because Thomson Reuters was a competitor. Philippe Dep. 211–12.

In December 2015, Thomson Reuters sent Philippe an indication of interest in acquiring the Company for $175 million, subject to further diligence but without a financing contingency. JX 810. The indication of interest expired on January 5, 2016. *Id.* at 3. Philippe did not share it with the Board until January 8, 2016. *See id.*

Although the indication of interest had expired, Philippe communicated with Thomson Reuters regarding a potential transaction over the following weeks. *See* JX 610. The Company uploaded documents to a data room, Thomson Reuters enlisted outside counsel to advise them on a potential transaction, and the parties signed an NDA. *See* JX 610 at '516–17; JX 822 at 1. The Committee also considered the possibility of a transaction and discussed the process with its advisors. *See* JX 820.

During the discussions, Trudeau told Grandi that Thomson Reuters had expressed "some concern with having Philippe as the sole spokesperson on [the Company's] side." JX 611 at '519. Trudeau reported that Thomson Reuters nevertheless remained "very interested." *Id.*

Other impediments, however, proved fatal. Thompson Reuters balked at the implications of this litigation. JX 822 at 2. The Company worried about Thomson Reuters' compliance with the European antitrust laws. *See* JX 611 at '519; JX 822 at 1. The Company also feared that Thomson Reuters was using the due diligence process to obtain information about a competitor and was not seriously interested in a transaction. *See* JX 822 at 1. Ultimately, Thomson Reuters did not make a formal offer. *See* Trudeau Tr. 911–12; Grandi Tr. 592–93.

## J. The Stay

The case was tried on February 16–19, 2016. The parties agreed to a schedule to govern post-trial briefing, and the court set post-trial argument for June 1, 2016.

In April 2016, however, the Board received a demand letter from an attorney representing an employee in the Company's sales department who claimed that Philippe had committed assault and battery against his client. Grandi and Schroeder asked the Company's outside counsel to investigate the claims. While the investigation was ongoing, the Board instructed Philippe not to participate in daily sales meetings or to communicate with the complaining employee.

30

Philippe failed to follow these instructions. During a meeting of the Board on May 10, 2016, Schroeder, Grandi, Placenti, and Trudeau voted to place Philippe on paid leave.

In response, Philippe purposed to act by written consent on behalf of holders of a majority of the common stock to remove Schroeder and replace him with Christophe Roupie. After Philippe purported to take these actions, Philippe, Patrick, and Roupie left the meeting. The remaining directors, including Schroeder, resolved to place Philippe on leave for six months, to install Schroeder as Interim President and CEO, to remove Philippe as Chairman, to remove Philippe as a director and officer of each of the Company's subsidiaries, and to create an executive committee of the Board consisting of Grandi, Placenti, and Trudeau.

That evening, the Board notified the Company's employees of the actions it had taken. Philippe responded by sending an email to all the Company's employees asserting that the Board's actions were illegal and ineffective. The next day, Philippe sent a further email to all the Company's employees denying that any changes in the Company's leadership had occurred, except for his replacing Schroeder with Roupie.

On May 12, 2016, Schroeder, Grandi, Placenti, and Trudeau filed an action under Section 225 of the DGCL against Philippe, Patrick, and Roupie. The plaintiffs sought determinations that the actions Philippe had taken by consent were invalid and that the actions they took as a Board majority were valid. *See* C.A. No. 12328-VCL, Dkt. 1.

31

In light of these developments, the plaintiffs moved to stay proceedings in this action pending resolution of the Section 225 action. By order dated May 23, 2016, the court granted the motion. Dkt. 275.

## K.  Continental Revives The Litigation.

For the next four years, the case remained stayed. During this period, the Board removed Philippe permanently from his positions with the Company, and litigation broke out on multiple fronts between Philippe, his former colleagues, and the Company. *See* Dkt. 344. Philippe sought to lift the stay for limited purposes, and the court addressed a motion by Philippe to compel Morris Nichols to produce its litigation file. *See* Dkts. 306, 317, 323. Otherwise, however, the stay remained in place. *See* Dkt. 307.

In June 2020, Continental moved to lift the stay, observing that the Section 225 proceeding had concluded. Dkt. 344. That was true, but it was not why Continental sought to lift the stay. The Section 225 action had wrapped up years earlier, in February 2017, and no one had sought to resuscitate this litigation.

The real reason that Continental sought to lift the say was because the Company had entered into an agreement to sell a subsidiary to Singapore Exchange Limited. That transaction would result in the Company having sufficient funds legally available to redeem all the outstanding shares of Preferred Stock, plus the ability to pay any interest that was due.

On June 26, 2020, the Board approved a payment of $5,485,947 to Continental to settle its redemption claim. Continental rejected the offer. *See* Dkt. 367.

As of July 7, 2020, the Company had at least $6,454,504.86 in legally available

32

funds that could be used for redemptions. On August 27, 2020, the Company paid Continental the full redemption price of $6,454,504.86 in exchange for its 386,266 shares. The Company also paid Continental $17,593.26 in interest, which represented the amount of interest that accrued on the full redemption amount less the settlement offer, assuming that interest began to run on July 7 at an annual rate of 13%. *See* Dkt. 369.

Although this court had rejected a similar argument years before, Continental maintained that it was entitled to 13% interest per year on the full redemption price because the Company had defaulted when it failed to redeem one-third of Continental's shares on each of the redemption dates. Continental claimed that it was entitled to interest of approximately $6 million, or 93% of the redemption amount. *See* Dkt. 348.

The TCV Funds did not join Continental in seeking to lift the stay. The TCV Funds and all other holders of Preferred Stock (except Continental) settled their dispute with the Company over the redemption. They accepted the redemption price plus a premium equal to approximately 23% of the redemption amount. *See* Dkt. 348 ¶ 10. Having resolved their dispute with the Company, the TCV Funds sought and obtained an order dismissing them from the case. *See* Dkts. 347, 360.

Even though Continental only sought relief in the form of an amount of money it claimed to be due, Continental moved to expedite the remaining post-trial proceedings. Dkt. 348. The court granted the motion to lift the stay but denied the motion to expedite. *See* Dkts. 358, 359. The parties completed post-trial briefing on a non-expedited schedule, and the court heard post-trial argument.

## II.     LEGAL ANALYSIS

Continental sought to prove that the Company breached the redemption obligation found in Section 7 of the Charter (the "Redemption Provision") by not fully redeeming its shares of Preferred Stock. Continental maintains that the Company had a contractual obligation to make three equal payments of $2,370,942.91 to Continental in September 2014, March 2015, and September 2015. Continental asserts that because the Company did not make those payments, interest began to accrue at a rate of 13% on each payment (the "Default Rate"). Recognizing that the Company redeemed some of Continental's shares in 2014 and 2015, and recognizing that the Company has now paid the full redemption price plus some interest, Continental seeks a monetary judgment equal to the additional interest that Continental contends is due.

According to Continental, all it needed to do to prove a *prima facie* case of breach of contract was point out that the Company did not redeem all of its shares and pay the full redemption amounts on the dates contemplated by the Charter. At that point, Continental says that the burden shifted to the defendants to prove that spending a single dollar more on redemptions would have rendered the Company insolvent.

Continental's position runs contrary to binding Delaware Supreme Court precedent, which holds that the party seeking to enforce a mandatory redemption provision has the burden of proof. *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.* (*ThoughtWorks II*), 37 A.3d 205, 211 (Del. 2011). "When a board decides on the amount of surplus available to make redemptions, its decision is entitled to deference absent a showing that the board: (1) acted in bad faith, (2) relied on unreliable methods and data, or (3) made determinations so far

34

off the mark as to constitute actual or constructive fraud." *Id.* This court previously said precisely that in a ruling that remains law of the case. *See TradingScreen I*, 2015 WL 1598045, at *7.

In a fallback argument, Continental seeks to prove its case within the confines of binding precedent by showing that when determining the amount of funds that could be used for redemptions, the individual defendants relied on unreliable methods and data, made determinations so far off the mark as to constitute constructive fraud, and acted in bad faith. Continental failed to carry its burden. Contrary to Continental's assertions, the individual defendants determined appropriately that the Company needed $20 million in cash to operate as a going concern, and the individual defendants properly used all of the funds in excess of that amount for redemptions.

Continental thus failed to prove that the defendants' breached the redemption right. Notwithstanding that fact, Continental maintains that it is entitled to eight years of interest at the Default Rate. This court previously held that under the plain meaning of the Redemption Provision, interest only accrues at the Default Rate if the Company defaults under the Redemption Provision, meaning that the Company had the ability to redeem additional shares and failed to do so.

Continental did not prove that the Company had additional funds that it could deploy legally for redemptions in 2014 and 2015, so Continental is not entitled to interest from that period. Continental did prove that it is entitled to interest at the Default Rate for the period from July 7, 2020, when the Company had funds that it could deploy legally for the redemption, until August 27, 2020, when the Company made the redemption payment plus

35

some interest. Continental also is entitled to pre- and post-judgment interest at the Default Rate on the additional amount of interest to which Continental was entitled as of August 27, 2020, which shall accrue until the date of payment.[20]

## A.    Continental's Arguments About The Burden Of Proof

Continental asserts that it established a *prima facie* case for breach of the Redemption Provision merely by showing that the Company failed to redeem its shares in 2014 and 2015. Continental claims that once it demonstrated that simple fact, the burden of proof shifted to the defendants to prove that they were unable to redeem Continental's shares. Those contentions misstate Delaware law.

When bringing a claim for a breach of a mandatory redemption provision, the plaintiff must prove that the corporation had additional funds that it could deploy legally for redemptions (commonly called "funds legally available"), yet failed to deploy the funds for that purpose. *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.* (*ThoughtWorks I*), 7 A.3d 973, 988–89 (Del. Ch. 2010), *aff'd*, *ThoughtWorks II*, 37 A.3d at 211. The existence of funds legally available operates as a condition precedent to the enforcement of a mandatory

---

[20] In addition to its claim for breach of the Redemption Provision, Continental asserted a claim for breach of fiduciary duty. That claim is meritless. The Redemption Provision was a special contractual right held by the Preferred Stockholders. Thus, the directors did not owe fiduciary duties to the Preferred Stockholders in connection with the Redemption Provision. *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*21 (Del. Ch. Apr. 14, 2017) (collecting authorities). The claim for breach of fiduciary duty also would not support the existence of a default, which is a prerequisite for award of interest at the Default Rate. The claim for breach of fiduciary duty is thus irrelevant to the only issue remaining in the case.

redemption right. *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*, 2014 WL 2943570, at *6 (Del. Ch. June 27, 2014); *see Harbinger Cap. Master P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 221 (Del. Ch. 2006) (holding that the existence of funds legally available was a condition precedent to the right to a dividend). Thus, a preferred stockholder like Continental that seeks to enforce a mandatory redemption right bears the burden of proving the existence of funds legally available. *See, e.g.*, 11 William Meade Fletcher et al., *Fletcher's Cyclopedia of the Law of Private Corporations* § 5310 (perm. ed., rev. vol. 2011) ("[T]he burden rests upon the preferred shareholder to show that redemption can be accomplished without prejudicing the rights of creditors.").

Whether the corporation had funds that could have been deployed legally to redeem more shares is not a valuation exercise that the court decides as if the case were a mini-appraisal. *ThoughtWorks I*, 7 A.3d at 988. A board's determination as to the amount of funds legally available is a judgment-laden exercise entitled to deference. *See ThoughtWorks II*, 37 A.3d at 211. "In the absence of bad faith or fraud on the part of the board, courts will not substitute our concepts of wisdom for that of the directors" as to the amount of funds available for redemptions. *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 156 (Del. 1997) (cleaned up). Therefore, to establish that a corporation failed to comply with a mandatory redemption right, the party seeking to enforce the right must prove that the board "(1) acted in bad faith, (2) relied on unreliable methods and data, or (3) made determinations so far off the mark as to constitute actual or constructive fraud." *ThoughtWorks II*, 37 A.3d at 211; *accord. TradingScreen I*, 2015 WL 1598045, at *7.

37

To argue for a different rule under which the defendants would have the burden of proof, Continental relies on two Delaware cases from different contexts. Both cases applied the hornbook principal of contract law that a party who contends that its contractual obligation was excused bears the burden of proving the grounds for excusal. But neither case involved a mandatory redemption obligation; both involved traditional third-party contracts under which a counterparty could gain a judgment entitling it to exercise creditors rights.[21] Special considerations apply to mandatory redemption provisions because of the junior position that equity holders occupy in the capital structure. Both the DGCL and the common law impose restrictions on redemption rights that other contract claimants do not face. *See* 8 *Del. C.* § 160(a)(1); *ThoughtWorks I*, 7 A.3d at 986–87 (collecting authorities).

Continental disputes these realities, asserting that "[i]t makes no sense to tell one class of contract holders—with a contract right to a specific payment on a specific day—that its contract right can't be reduced to judgment because a judgment creditor sits higher in the 'stack' than a stockholder." Dkt. 255 at 6 n.3. But an equity investor is not like other contractual claimants: The equity investor purchased equity, which is presumptively

---

[21] *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 755 (Del. Ch. 2008); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 53 (Del. Ch. 2001). In its reply brief, Continental cited additional cases for the proposition that a party to a contract who seeks to excuse its non-performance on the basis of illegality bears the burden of proving that affirmative defense. Those cases did not involve mandatory redemption rights either, nor did they involve comparable issues. *See Fonds de Regul. et de Controle Cafe Cacao v. Lion Cap. Mgmt., LLC*, 2007 WL 315863, at *4–5 (Del. Ch. Jan. 22, 2007) (considering contention that shares were void for lack of consideration); *Rothenberg v. Santa Fe Pac. Corp.*, 1992 WL 111206, at *4 (Del. Ch. May 18, 1992) (assessing court's ability to consider an exculpatory provision at the pleading stage).

permanent capital. *See ODN*, 2017 WL 1437308, at \*18. Black-letter law recognizes that

"the shareholder's right to compel a redemption is subordinate to the rights of creditors."

11 Fletcher et al., *supra*, § 5310.

> As against creditors of the corporation, preferred shareholders have no greater rights than common shareholders. They have no preference over them, either in respect to dividends or capital, and have no lien upon the property of the corporation, except if a statute provides otherwise. On the contrary, their rights, both in respect to dividends and capital are subordinate to the rights of such creditors, and consequently they are not entitled to any part of the corporate assets until the corporate debts are fully paid. Nor can the corporation give them any preference, either in respect to the payment of principal or dividends, which will be superior to the rights of creditors, unless by virtue of express statutory authority.

*Id.* § 5297 (footnotes omitted). The Bankruptcy Code implements these principles by providing that if a preferred stockholder has obtained a money judgment for the amount of an unsatisfied redemption obligation, then that money judgment has a special, subordinated status, junior to all other creditors, that prevents the preferred stockholder from exercising the full rights that a true creditor would possess.[22] An action for a money judgment based on a mandatory redemption right is different precisely because the plaintiff seeks to transform itself from a holder of equity into a creditor. *See QC Hldgs., Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at \*10 (Del. Ch. Aug. 28, 2018) (explaining that, after exercising

---

[22] *See* 11 U.S.C. § 510(b) (providing that a claim "for damages arising from the purchase or sale of . . . a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security"); *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002) (explaining policy underlying Section 510(b) of "prevent[ing] disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy").

its redemption right, "QC Holdings became a contractual claimant, albeit one that could not enforce the traditional rights of a creditor because of the statutory and common law limitations on redemption").

As further support for its contention that the defendants should bear the burden of proof, Continental relies on decisions from other jurisdictions that addressed mandatory redemption rights. "[T]here is no consensus among the state courts as to who bears the burden of proof in an action to enforce a stock redemption agreement. Some courts have placed the burden upon the plaintiff shareholder. Other courts have placed the burden on the corporation." *In re Jobs.com, Inc.*, 283 B.R. 209, 215 n.3 (Bankr. N.D. Tex. 2002) (citations omitted). Continental found four cases from two jurisdictions that placed the burden of proof on the defendants, but they do not accurately describe Delaware law. *See Richards v. Ernst Wiener Co.*, 100 N.E. 592 (N.Y. 1912); *Nakano v. Nakano McGlone Nightingale Advert., Inc.*, 377 N.Y.S.2d 996 (N.Y. Sup. Ct. 1975); *Borst v. E. Coast Shipyards, Inc.*, 105 N.Y.S.2d 228 (N.Y. Sup. Ct. 1951); *Stockbridge v. Gemini Air Cargo, Inc.*, 611 S.E.2d 600 (Va. 2005).

In yet another effort to argue that the defendants should bear the burden of proof, Continental asserts that a party seeking to enforce a mandatory redemption right should only have to prove the existence of legally available funds if the phrase "funds legally available" or some variant appears explicitly in the redemption provision. As the court has already held in this case, whether the phrase appears expressly or not does not affect the allocation of the burden because in its absence, "a comparable limitation [is] implied by law." *See TradingScreen I*, 2015 WL 1598045, at *5–6 (quoting *ThoughtWorks I*, 7 A.3d

40

at 990). The phrase "funds legally available" or some similar variant does not appear in the Redemption Provision, but that does not alter the allocation of the burden of proof. The party seeking to enforce the mandatory redemption right first must prove a condition precedent by establishing that the corporation had funds that it could deploy legally for redemptions.

Finally, Continental argues that the defendants should bear the burden of proving illegality because they pled that defense affirmatively in their answer. The defendants' assertion of that defense does not dictate the allocation of the burden of proof on the underlying claim. As part of its affirmative claim, Continental must prove that in determining the amount of funds that could be legally deployed for a redemption, the board acted in bad faith, relied on methods and data that were unreliable, or made determinations so far off the mark as to constitute actual or constructive fraud. *See ThoughtWorks II*, 37 A.3d at 211; *TradingScreen I*, 2015 WL 1598045, at \*7.

The fact that Continental currently resists the limitations that the law imposes on its redemption right is nothing new.

> Parties seeking to enforce redemption rights regularly chafe against these limitations, but they confer substantial benefits on both issuers and capital providers during other phases of the corporate life cycle. For example, the limitations on redemption enable preferred stock with debt-like features to be classified as equity for tax purposes, thereby avoiding the problem of imputed interest and lowering the cost of capital for [companies issuing preferred stock]. The same ability to treat preferred stock with debt-like features as equity also carries benefits for companies operating in regulated industries, such as financial institution that have to meet capital requirements.

41

*QC Holdings*, 2018 WL 4091721, at \*10 n.39 (citations omitted). A sophisticated investor that opts to purchase preferred stock, as Continental did, must take the bitter with the sweet.

**B.  The Assertion That The Directors Had A Duty To Redeem Shares Until The Brink Of Insolvency**

Continental next theorizes that to defeat a claim for breach, the defendants had to prove that if they had deployed any more funds for redemptions, then they would have rendered the Company insolvent.[23] For the reasons discussed previously, the burden of proof did not shift to the defendants; it remained with Continental. Equally important, a mandatory redemption right does not obligate directors to spend on redemptions to the brink of insolvency. The directors are entitled to retain sufficient funds to ensure that the corporation remains a going concern. *See ODN*, 2017 WL 1437308 at \*14; *see also In re Int'l Radiator Co.*, 92 A. 255, 255 (Del. Ch. 1914) (Curtis, C.) ("A corporation cannot purchase its own shares of stock when the purchase diminishes the ability of the company to pay its debts, or lessens the security of its creditors.").

When facing a mandatory redemption obligation, a corporation's directors must determine the amount of funds that the corporation can legally deploy for redemptions.

---

[23] *See* Dkt. 255 at 2–3 ("Plaintiffs' position is simple: if Defendants are able to prove a Redemption payment would, in fact, cause insolvency (either balance sheet or cash flow), then TradingScreen has a valid excuse to postpone that payment until it can be made (in whole or in part) without causing insolvency."); *id.* at 9 ("Stated differently, TradingScreen was obligated to redeem Preferred Stock from any and all cash available, and TradingScreen did not have discretion to deploy cash for other purposes unless such diversion of cash was necessary to avoid insolvency."); *id.* at 14–15 ("TradingScreen must show that there were no viable options it could exercise to allow it to timely perform (in whole or part) without disastrous financial consequences.").

One limitation on the corporation's ability to deploy funds stems from Section 160 of the DGCL. That section authorizes a Delaware corporation to redeem its shares, then immediately qualifies the grant of authority by providing that "no corporation shall . . . [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation." 8 *Del. C.* § 160(a)(1). There is also an exception to the exception: A corporation "may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock . . . if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title." *Id.*

"A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined by 8 *Del. C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock." *Klang*, 702 A.2d at 153. "Net assets means the amount by which total assets exceed total liabilities." 8 *Del. C.* § 154. Under Section 160, therefore, "unless a corporation redeems shares and retires them to reduce its capital, 'a corporation may use only its surplus for the purchase of shares of its own capital stock.'" *ThoughtWorks II*, 37 A.3d at 210 (quoting *Int'l Radiator Co.*, 92 A. 2 at 256).

Other sources of law can also constrain a corporation's ability to deploy funds to redeem shares. As a matter of common law, a corporation "cannot purchase its own shares of stock when the purchase diminishes the ability of the company to pay its debts, or lessens the security of its creditors." *ThoughtWorks I*, 7 A.3d at 987. "The corporation [must] be

43

able to continue as a going concern *and* not be rendered insolvent by the distribution." *Id.* at 988 (emphasis added). "To continue as a going concern, a corporation needs sufficient resources to operate for the foreseeable future without the threat of liquidation." *TradingScreen I*, 2015 WL 1598045, at *6 (internal quotation marks omitted); *accord. Klang*, 702 A.2d at 154.

A redemption payment that renders a corporation insolvent is thus unlawful, but insolvency is not a bright-line demarcation. As the foregoing authorities show, the corporation must be able to continue as a going concern. The directors are not obligated to redeem shares up to the brink of insolvency. The directors are entitled to (and must) use their judgment to retain sufficient resources to operate for the foreseeable future without the threat of liquidation.

Implicitly anticipating this result, Continental falls back to the concept of the "foreseeable future" and argues that it cannot mean two years. Instead, Continental claims that "the applicable insolvency tests permit forward-looking consideration of solvency for one year." Dkt. 366 at 11–15. The authorities do not establish a bright-line, one-year rule. Instead, this court's precedents refer to the foreseeable future generally, and that concept recognizes that companies are different and that directors must have discretion when evaluating the appropriate time horizon and the resources required for their particular corporation to continue as a going concern. *See ODN*, 2017 WL 1437308, at *14–15 & n.7 (collecting authorities); *TradingScreen I*, 2015 WL 1598045, at *7 n.41 (agreeing that it is appropriate to look to "a reasonable period of time in the future" when assessing a company's ability to continue as a going concern); *cf. Webster's Third New International*

44

*Dictionary* (1976) (defining "foreseeable" as "to see (as a future occurrence or development) as certain or unavoidable"). In this case, the directors engaged in a meaningful process and determined that because of factors associated with the Company's business, they needed to account for a two-year period. That determination is one of the many judgment-laden issues that directors must confront when determining how much of the corporation's cash can be deployed to redeem equity.

A mandatory redemption obligation does not obligate the directors to jeopardize the corporation's status as a going concern. Nor does a mandatory redemption obligation impose a one-year, rolling event horizon on a company's use of cash. Continental's arguments are contrary to law.

## C.     The Claim Of Breach Under The Governing Standard

Having devoted much of its rhetorical firepower to arguing for changes in the law, Continental finally seeks to show that the Company breached its redemption obligation under the governing standard. As explained previously, to establish a breach of a mandatory redemption right, Continental had the burden to prove that the Committee acted in bad faith, relied on methods and data that were unreliable, or made determinations so far off the mark as to constitute actual or constructive fraud. *See ThoughtWorks II*, 37 A.3d at 211; *TradingScreen I*, 2015 WL 1598045, at *7. As on other issues, when determining the amount of funds available for redemptions, directors may rely in good faith on the records of the corporation, reports from management, advice from experts, and input from advisors. *See Klang*, 702 A.2d at 156 & n.12 (citing 8 *Del. C.* §§ 141(e), 160, 172).

45

### 1. Unreliable Methods And Data

Continental contends that the Committee used unreliable methods and data when determining the amount of funds that the Company could use for redemptions. Continental specifically attacks the Committee's judgments regarding the amount of capital that the Company needed to show on its balance sheet to demonstrate its financial strength to counterparties, the degree to which capital was required to comply with foreign regulatory requirements, and the amount the Company would owe in repatriation taxes.[24] Continental failed to carry its burden on this issue.

Continental first challenges the Committee's judgment regarding the amount of capital that the Company needed to show on its balance sheet to demonstrate to counterparties that it was financially sound, which everyone called "show capital." Continental points out that (i) management provided recommendations on show capital and that (ii) the Committee's financial advisors did not create their own, independent calculation of show capital. Continental concludes that the record contained insufficient evidence to support the need for show capital.

---

[24] In its reply brief, Continental argues that the Company's failure to implement Pearl Meyer's compensation recommendation means that the Committee unreasonably relied on it. Continental waived this argument by failing to raise it in its opening brief. *See Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) (explaining that, "under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion" and "should not hold matters in reserve for reply briefs," which "should consist of material necessary to respond to the answering brief").

There is nothing wrong with management providing a recommendation on show capital. The record shows that management engaged in a good faith process that resulted in an estimated range and recommendation regarding show capital. Gross led the process, and he enlisted the help of Tom Mahoney, the Company's COO, in gathering for the Committee documentation "as to either clients, potential clients, and/or suppliers who have requested/required financial information on the Company." JX 386 at '635; *see* Gross Dep. 249–50. Mahoney sent Gross examples of requests from counterparties for the Company's financial statements, and he expressed his view that counterparties wanted to see an amount of cash equal to "some percentage of [the Company's] annual expense [in] total and at a minimum a multiple of the projected revenue from [the counterparty]." JX 386 at '634. Gross also knew that counterparties had raised the issue of show capital. *See* Gross Tr. 461–62. Management ultimately recommended a capital reserve of $20–30 million based on their interactions with counterparties and their perception of the market. *See* JX 330 at 13; Dudney Dep. 178–83, 217–18.

There is nothing suspicious about the Company's financial advisors not generating their own, independent calculation of show capital. Financial advisors regularly rely on information provided by management, usually in the form of financial projections.[25] The

_____

[25] *See, e.g.*, *Nguyen v. Barrett*, 2015 WL 5882709, at *3–4 (Del. Ch. Oct. 8, 2015) (acknowledging that financial advisor relied on management's projections in developing its DCF valuation); *In re Riverbed Tech., Inc. S'holders Litig.*, 2015 WL 5458041, at *7 (Del. Ch. Sept. 17, 2015) (noting that financial advisors relied on management's inputs to the free cash flow projections and capital expenditure projections in connection with fairness opinion); *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 673736, at *5 (Del. Ch. Feb. 25, 2013) (acknowledging that financial advisor relied on management projections in

fact that the financial advisor has relied on management's projections and has not prepared an independent valuation is a standard disclosure in fairness opinions.[26] The record shows that AlixPartners worked closely with Gross to understand the Company's cash forecast and its need for cash.[27] Through its presentation, AlixPartners synthesized management's views and presented the information to the Committee.

The Committee was entitled to consider management's views when exercising its judgment on the amount of capital that the Company needed to retain. The Committee did not blindly adopt management's assessment. The Committee deliberated, discussed the level of capital that the Company needed with its advisors, reviewed a detailed cash forecast for the Company, and determined that $20 million was the appropriate figure.

---

preparing its fairness opinion); *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) (same); *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 75 (Del. Ch. 2007) ("According to counsel, Lehman will not base a fairness opinion on projections that have not been prepared entirely by management."); Sean J. Griffith & Anthony A. Rickey, *Objections to Disclosure Settlements: A How-To Guide*, 70 Okla. L. Rev. 281, 305 (2017) (indicating that financial advisors commonly rely upon free cash flow figures generated by management when preparing fairness opinions); Stephen A. Radin, *The Director's Duty of Care Three Years After* Smith v. Van Gorkom, 39 Hastings L.J. 707, 740–41 (1988) (discussing financial advisors reliance on management projections).

[26] *See, e.g.*, *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 202 (Del. Ch. 2007) ("[I]n keeping with the industry norm, William Blair's fairness opinion devotes most of its text to emphasizing the limitations on the bank's liability and the extent to which the bank was relying on representations of management."); *In re Pure Res., Inc. S'holder Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) (indicating that fairness opinions are often "qualified by a gauze of protective language designed to insulate the banker from liability").

[27] *See* JX 302 at 12; JX 310 at 12; *see also* JX 281 at 11; JX 298 at 12; JX 330 at 12, 43.

The Committee also had other sources of information that it considered, such as the Company's historic cash balance and the levels of capital maintained by the Company's peers. The Company's historic cash balance ranged from $30 to $50 million. *See* JX 186 at '207. The Company's peers maintained cash balances at similar or greater levels. *See* JX 260 at '988; Gross Tr. 440. The Committee exercised its judgment in selecting a significantly lower figure of $20 million.

At trial, Trudeau testified as the plaintiffs' principal witness. He agreed that the Committee followed appropriate steps when determining the amount of funds available for redemptions. Trudeau Tr. 859–60. He agreed that the Company prepared a proper cash forecast, and he had no dispute with the projections. *Id.*at 860–61. He also agreed that the Company needed to maintain at least $10–15 million in working capital. *Id.* 790–94. And he agreed that the Company needed "at least $10 million to demonstrate financial strength" to its counterparties. *Id.* 838–39; *see also* Purcell Dep. 77–79. An internal TCV presentation stated that the Company needed $15 million "to stay in business." JX 15 at 3. TCV's figure of $15 million was sufficiently close to the Committee's figure of $20 million to support the reliability of the latter amount. The Committee made a judgment-laden decision using appropriate inputs. Continental did not prove otherwise.

Continental also disputes whether there were regulatory restrictions on the Company's use of capital and the extent to which the Company faced repatriation taxes. Neither issue affected the Committee's determination of the amount of funds available for redemptions. The Committee did not consider those potential restrictions because they did not have sufficient information about them. Grandi Tr. 564; Schroeder Tr. 650. When

49

AlixPartners presented the range of funds legally available for redemptions, AlixPartners treated the restricted cash attributable to regulatory capital and the reserve for repatriation taxes as co-extensive with show capital. *See, e.g.*, JX 330 at 12 (noting that "show capital" was "inclusive of the restricted cash"). Eliminating the entire amount allocated to regulatory capital and repatriation taxes thus would not have reduced the $20 million in capital that the Committee determined was necessary for the Company to remain a going concern. *See* Gross Tr. 497–98; Schroeder Tr. 650. Continental's attacks on these components do not provide a basis to question the Committee's judgment.

Continental failed to prove that the Committee used unreliable data or methodologies when determining the amount of funds that could be deployed legally for redemptions. The Committee followed an appropriate process.

### 2. Constructive Fraud

Continental next argues that the Committee's determinations of surplus and available cash were so off the mark as to amount to constructive fraud. Because the Company's available cash was less than its surplus, the former served as the binding constraint on redemptions. This decision therefore only evaluates whether the Committee reached a determination regarding available cash that was so off the mark as to constitute constructive fraud.

To support its claim of constructive fraud, Continental argues that during the redemption process, the Company's directors and officers manipulated the Company's discretionary spending to make it seem like the Company would less cash available for redemptions. As evidence, Continental points out that management recommended

50

increasing employee compensation and paying bonuses in cash. Continental relies heavily on a December 2014 email from Grandi to the other members of the Committee in which he wrote: "If we use stock rather than cash as retention, then we will have to pay the cash they [sic] we had earmarked for that purpose to the redeemers. We lose the argument that we have used to justify retention of cash. . . ." JX 828 at '522.

Continental failed to carry its burden on this issue. The Committee approved increases in employee compensation after receiving a report from Pearl Meyer, an outside compensation consultant, which advised that the Company's employee compensation ranked below the 25th percentile of peer companies and that to attract and retain talent, the Company needed to increase base compensation to the 75th percentile. JX 263 at 1, 3. When using the Company's cash forecast to determine the amount of cash that the Company needed to retain, the Committee notably did not use full amount of management's proposal. The Committee only included the additional $2.6 million in base compensation. The Committee excluded the additional $2.9 million for bonus compensation because the bonuses were tied to performance targets. *See* JX 327 at '590; JX 330 at 22.

The Committee also appropriately decided to continue paying bonuses in cash, as the Company had done during the preceding two years. That rational business judgment addressed legitimate concern about employee retention given both the Company's below-market levels of compensation and the questionable value of stock awards in light of the redemption obligation. *See* Gross Tr. 459; Grandi Tr. 479–89; Held Tr. 918–19. At the valuation of $120 million established for purposes of the redemption process, the common

51

stock had no value. An outside compensation consultant recommended the use of cash to pay bonuses, and the Committee agreed. Grandi wrote his email after the Committee made that determination. On its face, the email suggests only that Grandi wanted to remain consistent with the Committee's earlier determination.

Continental also claims that the defendants engaged in constructive fraud because they did not adequately explore the availability of debt and equity financing. On the debt front, Continental focuses on Philippe's reluctance to provide confidential information to financial sources and his eventual instruction to Gross to stop pursuing debt financing. The record shows that Philippe did not withhold confidential information to interfere with debt financing; he was generally obsessed with confidentiality and reluctant to share financial information with anyone. The record also shows that despite Philippe's instruction, Gross continued to search for financing. Gross Tr. 341–46, 401–03. The record establishes that the Company's credit profile was so risky that it could not obtain a meaningful amount of financing without an equity infusion. *See* JX 263 at '579–80; JX 327 at '588; Grandi Tr. 569–70; Schroeder Tr. 673–74; Romanelli Tr. 1074–76; Canning Tr. 1212–14. Moreover, no lender would provide a loan to fund a partial redemption in the context of on-going litigation. *See* Gross Tr. 403–35.

On the equity front, Continental again takes issue with Philippe's involvement in the process, but the record shows that his interactions with Deutsche Böerse, FactSet, and RealTick were appropriate. Philippe and Deutsche Böerse exchanged multiple term sheets, but discussions broke down after Deutsche Böerse experienced a change in management and moved in a different direction. Philippe and FactSet could not agree on a valuation for

the Company. Finally, Philippe legitimately resisted negotiating with RealTick given its status as a competitor and the Company's ongoing negotiations with two other bidders.

Philippe's interactions with Thomson Reuters were initially problematic. Thomson Reuters sent Philippe an expression of interest with a specific expiration date, and Philippe did not alert the Board until three days after that date. But despite Philippe's failure to alert the Board, the Company engaged with Thomson Reuters and began the diligence process. Trudeau believed that Philippe interfered with the negotiations, but as Trudeau acknowledged, there were other issues that proved fatal to a deal, including the existence of this litigation. It is more likely than not that a bid from Thomson Reuters would have failed in any event.

Continental failed to prove by a preponderance of the evidence that the Company could have executed on any of the equity transactions such that they could provide a source of readily accessible funds that the Company could use for redemptions. None of the transactions were simple equity investments. Each contemplated a multi-step transaction that would, over time, result first in a change of control of the Company and later in the acquisition of the Company. Given their complexity, the Committee properly did not view any of the transactions as providing a source of legally available funds that could be used for redemptions.

### 3.	Bad Faith

Last, Continental seeks to show that the Committee acted in bad faith. To carry its burden, Continental focuses on Philippe, Grandi, and Schroeder.[28]

Under Delaware law, a board acts in "bad faith" when it acts for a purpose other than a genuine attempt to advance the interests of the corporation. *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 253 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *see In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, *39 n.31 ("[G]ood faith encompasses a director's 'honest, non-pretextual use of power'") (quoting Leo E. Strine, Jr. et al., *Loyalty's Core Demand:  The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 665 (2010)).  Bad faith also encompasses an "intentional dereliction of duty" or "a conscious disregard for one's responsibilities" or acting "with the intent to violate positive law." *See In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

The record evidence shows that the defendants acted in good faith.  They did not disregard their responsibilities. They determined the amount of funds legally available for redemptions and declared those payments while seeking to protect the Company's ability to continue as a going concern. They subjectively believed they were acting in the best interests of the Company, and they did not act with an intent to violate positive law.

---

[28] In its reply brief, Continental added Patrick to the mix, but that addition came too late. Any claim as to Patrick was waived. *See Crowley*, 2006 WL 3095952, at *4.

In reaching this conclusion, the court has paid particularly close attention to Philippe's role in the process. He viewed himself as being at war with the Preferred Stockholders, and that orientation affected his actions. He also was an unreliable witness. If Philippe had determined the amounts of the redemptions unilaterally, then this would be a different case.

Grandi and Schroeder did not suffer from those problems. They were independent directors, and they sought to corral Philippe and constrain his excesses. They also ensured that the Committee did not bow to Philippe's wishes. Philippe originally maintained that based on its historical cash balances, the Company needed to maintain $30–$35 million on its books to operate. *See* JX 190 at '846; Philippe Tr. 242. The materials that AlixPartners initially prepared for the Company reported that management presented a range of $25–30 million in cash as necessary for the Company to stay in business. *See* JX 324 at 12, 21. Grandi and Schroeder challenged those assertions. *See* JX 327 at '590–91; Schroder Tr. 678–80; Grandi Tr. 490, 563–64, 577. The Committee ultimately decided on a cash floor of $20 million, between $10 and $15 million less than Philippe's starting position and between $5 and $10 million less than the range that AlixPartners initially presented. Based on the cash forecast, the Company would have $27.2 million in cash at the low point in its cash cycle. *See* JX 330 at 43. The Committee properly deducted the $20 million and used the remaining $7.2 million for redemptions. *See* Grandi Tr. 502.

Grandi and Schroeder thus acted in good faith in determining the amount available for redemptions. Later, they worked cooperatively with Trudeau and Placenti to remove Philippe from his positions and steer the Company to health. Their efforts contributed to

55

the transaction that generated the funds that enabled the Company to redeem the Preferred Stock.

If Grandi and Schroeder had been Philippe's pawns or had otherwise acted in bad faith, then they likely would have accepted management's initial estimate of the cash balance that the Company needed to maintain. Or they could have considered the Company's poor record of meeting its projections and adjusted anticipated revenue downward. Those and other paths easily could have led to the Company not making any redemptions. Grandi and Schroeder did not do those things. They ensured that the Committee made a good faith determination regarding the amount of funds available for redemptions.

Continental once again failed to carry its burden of proof. Continental did not show that the Committee acted in bad faith when determining the amount of funds available for redemptions.

## D.    The Implied Covenant

In its opening brief, Continental argued tersely that the defendants breached the implied covenant of good faith and fair dealing by failing to redeem its shares. Courts applying Delaware law invoke the implied covenant sparingly, and that principle applies all the more forcefully to preferred stock, where preferences must be express. *See* 8 *Del. C.* § 151; *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 535 (Del. Ch. 2001) (declining to apply implied covenant in context of preferred stock agreement). Here, the Redemption Provision establishes the full measure of Continental's rights.

The implied covenant also should not be used to create rights that a party failed to secure "at the bargaining table." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183–84 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE). The record established that TCV intentionally declined to seek stronger rights because TCV knew it was competing with other providers of capital and thought it would lose the deal if it insisted on them. *See* Trudeau Tr. 811. Continental opted to participate on the terms that TCV extracted. Continental cannot now use the implied covenant to obtain greater rights.

E.     **Interest**

Section 7.1.2 provides that "[i]n the event the Corporation defaults on any payments due pursuant to this [Section 7.1.2], interest shall accrue on all amounts then owed pursuant to this [Section 7.1.2] equal to an annual percentage rate of thirteen percent (13%)." Charter § 7.1.2. Continental argued originally that interest began to accrue at the Default Rate in September 2014, when the Company did not make the full payment called for by the Redemption Provision. Continental subsequently argued that interest began to run at the Default Rate from the dates that the three equal redemption payments were due.

This court has already held that interest did not begin to run because the Company was not in default. In ruling on a motion for judgment on the pleadings, this court explained: "Section 7 of the Charter provides that interest shall only accrue on amounts owed pursuant to that section if TradingScreen *defaults* on any payments that are due. A default is '[t]he omission or failure to perform a legal or contractual duty.'" *TradingScreen I*, 2015 WL 1598045, at *8 (alteration in original) (quoting *Default*, Black's Law Dictionary (6th ed. 1990)). The court noted that if Delaware law prevented the

57

redemptions, then the Company was not in default. *Id.* The court concluded that interest would begin to run at the Default Rate only if the Company had the ability to comply with the Redemption Provision and nevertheless did not, thereby defaulting. *Id.* If the parties wanted interest to start accruing whenever a redemption payment was not made, even if the non-payment resulted from the Company having insufficient funds that could be deployed legally for redemptions, then they could have drafted language that turned on the fact of non-payment rather than the existence of a default.

"[A] trial court's previous decision in a case will form the law of the case for the issue decided." *State v. Wright*, 131 A.3d 310, 321 (Del. 2016). "The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation." *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014) (quoting *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990)). The purpose of the doctrine is "to promote efficiency, finality, stability and respect for the judicial system." *Wright*, 131 A.3d at 321 (internal quotation marks omitted). Earlier rulings of a case control unless "(1) the prior ruling was clearly wrong; (2) there has been an important change of circumstances; or (3) equitable concerns render application of the law of the case doctrine inappropriate." *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2012 WL 1655538, at *4 (Del. Ch. May 9, 2012).

Continental argues that the court's holding was "clearly wrong" because it interpreted "default" as a noun rather than as a verb and "failed to consult multiple dictionaries to compare definitions." Dkt. 366 at 41. Black's Law Dictionary's defines the verb form of "default" as "to fail to perform a contractual obligation"—a definition that is

58

nearly identical to the noun form cited in *TradingScreen I. See Default*, Black's Law Dictionary (11th ed. 2019). The court appropriately relied on Black's Law Dictionary, a leading dictionary in the legal profession, as the basis for its interpretation. The court's analysis was not clearly wrong.

Continental also argues that the record was not fully developed at the pleading stage, such that adopting the court's previous ruling would "produce[] an injustice." *See Frederick–Conaway v. Baird*, 159 A.3d 285, 296 (Del. 2017). Although the factual record was not fully developed, the parties agreed that the relevant language was unambiguous, so the court only needed to consider the four corners of the Charter. *See, e.g.*, *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012). There was no injustice in the court ruling on this issue.

Based on the court's prior ruling, the Company only owes interest on funds that could be deployed legally for redemptions but which were not used for that purpose. Because the Company did not have additional funds that it could deploy for redemptions in 2014 and 2015, the Company did not breach the Charter with respect to those redemption payments, and interest did not begin to accrue then.

Continental is, however, entitled to interest on the redemption payment that the Company made on August 27, 2020. Those funds were available on July 7, 2020, when the Company offered to pay $5,485,947 to resolve Continental's claims. The defendants maintain that they made this offer as a settlement proposal. That is true, but it does not change the fact that the Company had legally available funds as of that date. By not making

59

the redemption when it had the funds legally available to do so, the Company breached the Redemption Provision, and interest began to accrue at the Default Rate.

Accordingly, interest at the Default Rate was due on $5,485,947 for the period from July 7, 2020 until August 27, 2020. The resulting amount was $99,648.85.

### III.      CONCLUSION

Judgment will be entered in favor of Continental in the amount of $99,648.85. Pre- and post-judgment interest at the contract rate of 13% per annum, compounded annually, is due on the deficiency from August 27, 2020 until the date of payment. Otherwise, judgment will be entered in favor of the defendants. The parties will present a final order that has been agreed upon as to form.